Elsie SIMER, et al.,
Plaintiffs-Appellants,

v.

Richard J. RIOS, Acting Director of Community Services Administration; Community Services Administration, Defendants-Appellees.

No. 80–2544.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1981.

Decided Oct. 7, 1981.

Jack L. Block, Chicago, Ill., for plaintiffs-appellants.

Lawrence Wimbush, Washington, D.C., for amicus curiae.

Neil H. Koslowe, Counsel Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before SWYGERT, Senior Circuit Judge, and PELL and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case raises many issues concerning the legality and eventual vacating of a settlement agreement entered into by the plaintiffs and the Community Services Administration (CSA).

I.

Suit was initiated on September 24, 1979 by eight individuals and Gray Panthers of Chicago, an unincorporated non-profit organization, as a class action. The complaint alleged several claims against CSA for its administration of the Crisis Intervention Program (CIP).

CIP was a program funded under the Emergency Energy Conservation Services Program (EECSP), 42 U.S.C. § 2809(a)(5), and was designed "to enable low income individuals and families, including the elderly . . . to participate in the energy conservation programs designed to lessen the impact of the high cost of energy . . . and to reduce . . . energy consumption." Id.[1]

One aspect of this program provided cash assistance for fuel and utility bills to qualified individuals.[2] The pertinent regulations

---

1. CSA was created as part of the 1975 amendments to the Economic Opportunity Act of 1964 and was to operate as the successor to the Office of Economic Opportunity. Pub.L.No. 93–644, § 9(a), 88 Stat. 2291 (codified as 42 U.S.C. § 2941).

2. Other programs of energy assistance funded by EESCP were:

energy conservation and education programs; winterization of old or substandard dwellings, improved space conditioning, and insulation; emergency loans, grants, and revolving funds to install energy conservation technologies and to deal with increased housing expenses relating to the energy crises; alternative fuel supplies, special fuel voucher or stamp programs; alternative transporta-

adopted by CSA conditioned the grant of assistance payments upon the production of a shut-off notice from a utility company.[3] Plaintiffs' complaint alleged that this regulation violated EECSP which provided that "[e]ligibility for any of the programs authorized under this section shall not be based solely on delinquency in payment of fuel bills." 42 U.S.C. § 2809(a)(5).

Within 10 days of the filing of the complaint, plaintiffs moved in the district court for a temporary restraining order and a preliminary injunction which would enjoin CSA from returning unspent funds from the 1979 program to the United States Treasury.[4] The district court entered a temporary restraining order which directed CSA not to return the unspent money to the Treasury until further court order.

Thereafter, both parties moved for summary judgment, plaintiffs contending that the regulation violated the plain letter of the statute. In response, CSA argued that assistance was to be offered only in cases of crisis or emergency and that the regulation was a reasonable means to ensure that a "crisis" did exist.[5]

At a hearing held on the motions for summary judgment, the district court indicated that it would rule for plaintiffs. In regard to defendant's contention that the shut-off notice requirement was consistent with the "crisis" emphasis of the statute the court stated:

I do not find the language about crisis in this statute. In Section 2809 of Title 42 in Paragraph 5, it talks about the Energy Conservation Service. It talks about the elderly and the near poor. It talks about lessening the impact of high cost of energy on such individuals and families. In other words, it does not speak in terms of crisis. It speaks in terms of helping poor and near poor people.

Hearing of Jan. 4, 1980, App. at 193.[6]

After the district court indicated that it would be inclined to rule for plaintiffs on the issue of the validity of the regulation, counsel for CSA indicated that settlement discussions might be appropriate. The district court agreed and continued to hold the motions for summary judgment under advisement.

---

tion activities designed to save fuel and assure continued access to training, education, and employment; appropriate outreach efforts; furnishing personnel to act as coordinators, providing legal or technical assistance, or otherwise representing the interests of the poor in efforts relating to the energy crisis; nutrition, health, and other supportive services in emergency cases; and evaluation of programs and activities under this paragraph.

42 U.S.C. § 2809(a)(5).

The EECSP originally was included in the 1975 amendments to the Economic Opportunity Act. Economic Opportunity Act, Pub.L.No. 93-644, § 5(d)(1), 88 Stat. 2294 (then codified as 42 U.S.C. § 2809(a)(12)). In 1978 EECSP was amended and codified as it presently reads. Pub.L.No. 95-568, § 5(a)(2)(E), (d), 92 Stat. 2426, 2427, 2439, 2440 (codified as 42 U.S.C. § 2809(a)(5)).

3. 45 C.F.R. 1061.52-3(c) provided:

[P]ayment of outstanding bills of regulated utilities is allowable only in those areas where shutoffs are not legally prohibited and where the applicant for assistance can produce a notice to disconnect.

4. The complaint was filed on September 24, 1979 and the hearing on the motion for a tem-

porary restraining order was held on September 26, 1979. Originally, CSA had designated May 31, 1979 as the termination date of the CIP program. This was extended to June 30, 1979 in settlement of other litigation against CSA. 45 C.F.R. 1061.52-4. CSA funds were to be returned to the United States Treasury as of September 30, 1979—the close of the fiscal year.

5. This emphasis on crisis is evident in regulations promulgated by CSA. CSA's statement of policy provides:

CSA's FY79 Crisis Intervention Program is not intended to be an income transfer program; nor does it entitle any person or household to a certain amount and/or form of assistance. Rather, the primary intent of the program is to make available to grantees funds which will enable them to respond to winter-related energy crises which endanger the health and survival of low-income households....

45 C.F.R. 1061.52-2.

6. All references to the transcripts or documents of record will be to the Appendix to Brief of Plaintiffs-Appellants.

The parties next appeared in court on April 25, 1980 with a settlement to present to the district court. At the prior hearing the parties and the district court discussed the problem of relief for the statutory violation. Several alternatives were discussed with varying opposition to each alternative stated by CSA. One possibility was that the 1979 program would be reopened and that the remaining funds would be administered and disbursed through this program. CSA objected to this because a new more extensive program for 1980 was presently functioning and was substantially different from the 1979 program. Therefore, reopening the 1979 program would be, in the words of CSA, an "administrative nightmare." Hearing of Jan. 4, 1980, App. at 186–87.

A second alternative considered at the hearing was to reprogram the funds from the 1979 program into the 1980 program. The major flaw with this proposal, according to the parties, was that it would not provide the greatest relief for those who were to benefit from the program.

The settlement eventually agreed to by the parties presented a third alternative—funding of programs which would accelerate long range solutions to the energy problems for the elderly.[7] The programs funded by the settlement included: 1) a four million dollar hypothermia program; 2) four million dollars for emergency energy conservation kits; 3) a two million dollar solarization program; 4) six and one-half million dollars to local groups to fund advocacy programs to represent the interests of energy consumers; 5) one million dollars for an "Emergency Preparedness/Impact Assessment" program; 6) $300,000 to fund a Small Farm Energy Project; 7) $350,000 to hire personnel to administer and monitor all of the above programs. In addition to the funding of these programs, each of the eight named individual plaintiffs received a cash payment of $250.00.

The parties presented the settlement to the district court and recommended that

the court approve the agreement. The parties informed the district court that the settlement was consistent with congressional intent and was a proper accommodation of the various conflicting interests at stake. The district court agreed with this characterization of the settlement and signed and entered the consent decree. At no time at this hearing was the issue of class certification or notice to the putative class members discussed or alluded to. Nor was settlement conditioned upon class certification or the putative class being bound by the judgment.

On August 20, 1980 an article entitled "A Sweetheart of a Lawsuit" appeared in the *Wall Street Journal.* The article was highly critical of the settlement in this case and indicated that it was the result of collusion between CSA and plaintiffs' counsel. According to the article, CSA entered into the settlement because funding for many CSA projects probably would be terminated. The settlement's distribution of the funds allowed CSA to continue to fund these "pet projects."

Approximately one month after the publication of the article in the *Wall Street Journal,* Senator Paul Laxalt sent a letter to defendant Richard J. Rios, acting director of the CSA. Senator Laxalt stated that he was "disturbed by reports that our adversary system of justice may have been compromised by the settlement in the case." Senator Laxalt requested an accounting of monies spent and unspent pursuant to the settlement and that "[u]ntil such time as the ... accounting has been delivered to me, and I have a chance to review it, I request that no additional funds be disbursed by the Community Services Administration." App. at 278. A copy of the letter also was sent to Judge Grady, the district court judge who signed the settlement decree.

On September 26, 1980 the district court issued an order, *sua sponte,* calling for a status conference in the case. The order, apparently referring to contacts by Senator Laxalt and discussions in the media, stated:

---

**7.** It is not exactly clear why this alternative would more directly aid those who were to

benefit from the program than reprogramming the funds into the 1980 program.

It has come to our attention that questions have been raised as to whether the "Stipulation and Agreed Order" in this case ... may provide for the funding of programs which Congress did not intend to be funded in this manner.

App. at 93.

The order set the status conference for October 6, 1980. On October 5, 1980 a "motion to intervene and motion for relief from the order" was filed by: Fred P. Meagher, a member of the putative class, Senators Paul Laxalt, Orrin Hatch, and Edward Zorinsky, and the Capital Legal Foundation (Capital).[8] The motion sought to vacate the order approving the settlement and to restrain any further spending pursuant to the settlement.

The above motion stated several grounds for intervention and for vacating the settlement. Most significantly, the intervenors contended that the settlement violated proper class action procedure under Rule 23(e) by failing to give putative class members notice and an opportunity to be heard. The intervenors also argued that the settlement was not in the best interests of class members or CSA.

At the status conference of October 6, 1980, the district court pursued several lines of inquiry regarding the settlement approved on April 25, 1980. First, the district court queried whether the disbursement of the funds pursuant to the settlement order was consistent with congressional intent. Second, the district court discussed the class action issue and intimated that it previously had concluded that class certification was properly denied.[9] The district court denied the motion to intervene and requested that memoranda be filed on whether or not the settlement order should be vacated.

On October 29, 1980 the district court issued a "Memorandum Opinion" which vacated the order of April 25, 1980 approving the settlement. Furthermore, in the opinion, the court denied the motion for class certification and held the claims of the organizational plaintiffs, Gray Panthers, nonjusticiable. The court concluded that since the eight individual plaintiffs had received their relief and the class action had been denied, there was no case or controversy before the court and ordered the case dismissed with prejudice.[10]

---

**8.** The motion characterized Capital as a "tax-exempt, non-profit public interest law firm...." App. at 269. As grounds for intervention Capital alleged that the settlement distributed funds to legal assistance organizations and Capital was excluded from the consideration of this distribution. The Senators alleged that they had an interest in seeing that funds were distributed consistent with congressional intent and an interest in protecting their votes as congressmen.

Senator Laxalt, in his letter of September 16, 1980 to Administrator Rios, directed Rios to disburse no more CSA funds. The order approving the settlement was entered on April 25, 1980. Thus, Senator Laxalt's letter ordering Rios not to disburse funds is apparently in conflict with Rios' obligation under court order. We cannot conceive that Senator Laxalt was ordering Rios to disobey a valid order entered by a United States District Court and have Rios risk a citation of contempt. We can only assume that Senator Laxalt either was unaware of the court order or believed it not to be in effect. This appears to be a fair reading of the events since Senator Laxalt filed a motion to intervene and a motion to vacate—the proper legal procedure for challenging an order of a United States District Court.

**9.** The issue of class certification had been discussed in the context of the various alternative settlement structures.

**10.** There appears to be some ambiguity as to whether this order dismissed the claims of all plaintiffs—the individuals as well as Gray Panthers—or merely dismissed the individual claims. The order states that "This cause is dismissed as to the individual plaintiffs, with prejudice, inasmuch as the subject matter between the defendants and the individual plaintiffs has been settled." App. at 149. However, in another part of the order the district court stated:

The organizational plaintiff, the Gray Panthers of Chicago stood in no better position than the class members it purportedly represented. Had those members been identified they should have been named; there was no indication that they were too numerous to be joined as individuals. Or, in the alternative, if they were too numerous to join, then the same practical obstacles to class certification applied to them as to any other possible class members.

App. at 147. Thus, it appears that the district court also dismissed the claim of the Gray Panthers for lack of standing. This conclusion

The "Memorandum Opinion" offered several rationale for vacating the order of April 25, 1980. Primarily, the court reasoned that the parties had misrepresented the facts and the law in prior hearings on the settlement. The alleged misrepresentations concerned whether the funding of programs provided for in the settlement was consistent with congressional intent and whether the parties informed the district court that absent its prior order the money would revert to the United States Treasury.

On October 30, 1980 plaintiffs filed a notice of appeal and requested an expedited briefing and hearing on the case. The latter motions were granted. On appeal many issues are presented for review by the briefs of the parties as well as those filed by amicus curiae.[11] However, the primary issues on appeal are the proper procedure to be utilized for settling class actions which have not been certified and whether this case should have been certified as a class action.

## II.

### A.

The initial issue which must be decided is whether the district court properly acted within the scope of Rule 60(b) in vacating the judgment approving the settlement decree. The district court held that there were two separate grounds for vacating the judgment—the judgment was void, Fed.R. Civ.P. 60(b)(4), and the judgment was obtained by misrepresentation or fraud on the court, Fed.R.Civ.P. 60(b)(3). On appeal, plaintiffs contend that the parties fully ap-

prised the district court of both the facts and the law and therefore there was no misrepresentation or fraud on the court. The Government agrees with plaintiffs' position on the issues of misrepresentation and fraud on the court. However, the Government argues that the judgment was properly vacated as void because "it granted class-wide relief without giving putative class members notice and an opportunity to be heard."[12]

We agree that the judgment cannot be vacated by reason of fraud or misrepresentation. An examination of the record leads us to the conclusion that the parties were sufficiently forthright with the district court on both the factual and legal issues in the case. The district court pointed to two separate matters on which it was misled—whether it was informed that without its order of September 26, 1979 the money would have reverted to the United States Treasury and whether the parties misled it on the issue of congressional intent. We proceed to discuss these allegations of misrepresentation and fraud.

The district court, in its October 29, 1980 order, concluded that:

> No one informed me that, without the order [of April 25, 1979] the $18 million would have to go back to the United States Treasury. No one alerted me to the possibility that the various projects described in the order might not have been within the contemplation of Congress at the time the money was appropriated.

App. at 145. This statement is contrary to statements made to the district court by

---

is further buttressed by the fact that counsel for Gray Panthers and the individual plaintiffs have briefed the issue of the Gray Panthers' standing. *See* Brief of Plaintiffs-Appellants at 56–57; Reply Brief of Plaintiffs-Appellants at 26–28. Nor have counsel for Gray Panthers informed the court that the October 29, 1980 order did not dismiss the Gray Panthers' claim.

**11.** Briefs of amicus curiae supporting the plaintiffs' position have been filed by: The National Council of Senior Citizens, Inc., The Illinois State Council of Senior Citizens Organizations, The Chicago Metropolitan Senior Senate, and Metro Seniors in Action; The Schenectady

Community Action Program, Milwaukee Community Relations/Social Development Commission, Rural Alaska Community Action Program, Committee on Training and Employment, Inc., Human Development Corp. of Metro St. Louis, Franklin County Community Action Corp., Saratoga County Community Action Agency, and National Center for Appropriate Technology.

Briefs amicus curiae supporting defendants' position were filed by Mid-America Legal Foundation and Capital Legal Foundation.

**12.** Brief for the Defendants-Appellees at 30.

counsel for plaintiffs in papers presented in their motion for a temporary restraining order and memorandum in support thereof.[13] Plaintiffs' "Notice of Motion" states that:

[Counsel for plaintiffs] shall appear before the Honorable Judge Grady . . . and shall . . . file the motion of plaintiffs to *restrain the defendants from returning any unobligated funds in the 1979 Crisis Intervention Program to the U.S. Treasury* pending further Court order. . . .

App. at 50 (emphasis added).[14]

Plaintiffs' memorandum in support of the motion states that "This motion seeks a court order preventing any return to the U.S. Treasury of the funds currently in dispute pending court order." App. at 51. The exigency of the situation is made even more explicit in the text of their memorandum. In arguing that a temporary restraining order was necessary because of the irreparable harm that would be suffered absent such relief, plaintiffs stated:

If CSA is not restrained from returning unobligated funds, the portion of the $200,000,000 CIP appropriation not obligated by that date will be returned to the United States Treasury. Should the court subsequently determine that the CIP has been unlawfully administered, the balance of the 1979 CIP funds will no longer be available for obligation on behalf of eligible applicants.

App. at 52–53. In light of these statements in the record we do not believe that the

---

13. App. at 50–51.

14. Technically, the motion does not state that the district court order would be the sole authority for preventing the money from reverting to the Treasury. However, it is fair to infer that had there been no danger of the reversion or another way to prevent it, plaintiffs would not have been applying for a temporary restraining order in the district court.

15. One final factor should be noted. In a prior action brought against CSA, *Grieg v. Olivarez*, No. 78–C–1646 (N.D.Ill.1978), Judge Grady prevented a similar reversion by entering a restraining order. This indicates that Judge Grady, through prior experience, was somewhat familiar with the problem of funds reverting to the Treasury.

---

parties misled the district court on the issue of whether its order was the sole authority for preventing the money from reverting to the Treasury.[15]

The district court also concluded that the parties misled it on the issue of whether the expenditures in the settlement agreement were consistent with congressional intent. Specifically, the district court believed that the parties failed to inform it that the expenditure of funds was only to be for crisis situations. App. at 149.

Again, this conclusion of fraud is not supported by the record. The issue of congressional intent and whether funding only was to be for crisis situations was sufficiently explored by the parties and the district court prior to settlement. At the hearing held on January 4, 1980, when the motions for summary judgment on the validity of the regulation were being discussed, the issue of congressional intent was explored.

MR. DOCKTERMAN [counsel for CSA]: If your bill is not due until next month then you have no immediate crisis.

THE COURT: The statute does not say anything about an immediate crisis, does it? In the sense that you are talking about, it talks about people who are having difficulty providing themselves with these various things that are covered by the program.

App. at 186. Defendants' reply memorandum on the motion for summary judgment

In its order of October 29, 1980 the district court stated that "a serious question of separation of powers appears to me to be involved." App. at 148. The court thought that its order of April 25 and eventual distribution through the settlement which prevented the reversion was a "substitution of judicial fiat for legislative action." App. at 148. This statement is not correct because Congress had already appropriated the money to be spent by CSA. The order of the district court preventing reversion in the light of potential recovery in litigation was fully within the court's authority. *See* 31 U.S.C. § 665(b); *National Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977).

presses the "crisis" contention and also notes the broad range of CSA-funded programs.

> Congress was addressing all energy programs, not just one segment of a particular program .... Since CIP was not designed solely to pay fuel and utility bills, but to provide a wide range of energy assistance, applicants without fuel bills could nevertheless be eligible. Any applicant in crisis because of payment of such bills was eligible for assistance.

> . . . . .

> Congress had directed CSA to limit its programs for use only in a "clear and demonstrated energy emergency."

App. at 265.[16]

Therefore, at several stages in the proceedings the parties informed the district court on the issue of congressional intent and whether disbursements by CSA could be made only for crisis situations. Although it does appear that there may have been some misunderstanding between Judge Grady and counsel about the settlement and its implication, we conclude that there was an insufficient basis to vacate the judgment for misrepresentation or fraud on the court.

**16.** CSA's position, that assistance be available only in "crisis" situations, was predicated on a Senate Committee on Appropriations report that recommended funding for the 1978 CIP program. The Committee report stated that the $200 million "be used only on a contingency basis when there is a clear and demonstrated energy emergency." S.Rep.No.95–564, 95th Cong., 1st Sess. 40 (1977).

Because we determine that the judgment should have been vacated for a different reason—that is, failure to give adequate notice—we need not decide whether the funding in the settlement was consistent with congressional intent nor whether such an error would require that the judgment be vacated under Rule 60(b).

**17.** Fed.R.Civ.P. 60(b)(4).

**18.** *V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 225 (10th Cir. 1979); *Bass v. Hoagland*, 172 F.2d 205, 209 (5th Cir.), *cert. denied*, 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1949); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2872 (1973).

Amicus National Council of Senior Citizens, Inc., et al. argues that the district court was without authority to vacate the judgment.

## B.

While we reject the district court's conclusion that fraud or misrepresentation was a proper basis for vacating the settlement order, we do conclude, on other grounds, that the settlement decree should have been vacated as void.

■ Mere error in the entry of a judgment does not render a judgment void for purposes of Rule 60(b)(4).[17] *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 374–78, 60 S.Ct. 317, 318–20, 84 L.Ed. 329 (1940). But where an error of constitutional dimension occurs, a judgment may be vacated as void. One such constitutional error for concluding that a judgment is void for purposes of Rule 60(b)(4) is if the judgment was entered in violation of due process.[18]

As is discussed below, in greater detail, entry of the settlement decree without notice to putative class members violated the due process rights of the class members. Entry of the settlement decree, while not binding on absent individuals, nonetheless did prejudice the rights of these individuals. Therefore, as a matter of due process, notice was required to protect their rights.

Specifically, it is contended that the district court could not vacate the judgment *sua sponte* nor could the intervenors, as non-parties, invoke Rule 60(b). We see no reason to decide whether the intervenors could invoke Rule 60(b). Rather, we conclude that the district court acted fully within its power in vacating the judgment. *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 n.2 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); *United States v. Jacobs*, 298 F.2d 469, 472 (4th Cir. 1961) (court has power to vacate judgment *sua sponte*). The cases cited to us by amicus are distinguishable *Dow v. Baird*, 389 F.2d 882, 884–85 (10th Cir. 1968); *Government of Virgin Islands v. Massac*, 277 F.2d 660, 663–64 (3d Cir. 1960). In *Dow* and *Massac* the district court offered no adequate reason for not utilizing its power under Fed.R.Civ.P. 59(d). Also, in *Dow* the court could have granted a post-trial motion filed by the defendants. Finally, we note that neither *Dow* nor *Massac* involved vacating a judgment as void because of a violation of procedural due process.

Because this notice never was delivered the judgment must be vacated as void. *Sertic v. Cuyahoga Lake, etc., Carpenters District Council*, 459 F.2d 579, 581 (6th Cir. 1972); *Sagers v. Yellow Freight Systems, Inc.*, 68 F.R.D. 686 (N.D.Ga.1975).

## III.

In their complaint filed on September 24, 1979 plaintiffs requested that the case be certified as a class action. The class was described as:

> all low income persons otherwise eligible for participation in the 1979 CIP who were denied 1979 CIP assistance by the federal defendants or discouraged from applying for assistance because they were not delinquent in the payment of their fuel bills for 1979.

App. at 2.

The case never was certified as a class action. At the initial hearing on the motions for summary judgment the district court indicated that the plaintiffs were entitled to judgment and that the "next step is what to do about it. That means certifying a class." Hearing of Jan. 4, 1980, App. at 195. At this point the parties decided that settlement discussions might be appropriate. The district court agreed and eventually the settlement decree was signed and entered. However, it appears that the issue of class certification disappeared from significance once settlement became apparent.

The district court, in its decision vacating the settlement, decided against class certification, concluding that a class action was unmanageable. On appeal we are faced with two issues—not necessarily separate. First, should the members of the putative class, either under Rule 23(e) or the Due Process Clause of the Fifth Amendment, have been given notice of the settlement? Second, if notice was necessary, was the case appropriate for class action status?

## A.

Plaintiffs first contend that notice was not required under Rule 23(e) because the rule applies only to settlement of a *certified* class action. In the alternative plaintiff contends that although notice may be required in some instances in a class action which has not been certified, this is not such a case.

Fed.R.Civ.P. 23(e) provides:

> *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

■■ The purposes served by Rule 23(e) are most evident in the case where a class has been certified and the case is settled or dismissed. Most importantly, the settlement or dismissal of the case will be res judicata as to claims of the individual class members. *Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940) (Stone, J.); 3B Moore's Federal Practice, ¶ 23.80[1] at 23–504 (3d ed. 1980). In the case where the claims are settled, important rights and remedies may be bargained away in the settlement process. Therefore, notice of the settlement is necessary as a matter of constitutional due process—an individual's claim cannot be extinguished without notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). After notification, class members can make a decision as to the proposed settlement—either choosing to be bound, objecting to, or eventually appealing the judgment.[19]

■ In a settlement entered without class certification the judgment will not have a res judicata effect on the claims of absent class members. Thus, a strong argu-

---

**19.** For a discussion of the issue of notice in class actions not certified see Wheeler, *Dismissal Notice and Statutes of Limitations in Federal Class Actions After American Pipe and Construction Co. v. Utah*, 48 S.Cal.L.Rev. 771 (1975); Comment, *Continuation and Representation of Class Actions Following Dismissal of Class Representative*, 1974 Duke L.J. 573; Newburg, Class Actions, §§ 5520, 5560, 5580 (1977).

ment can be made that the absolute notice requirement of Rule 23(e) should not apply. However, most of the early decisions rejected this contention and held that a putative class action must be assumed to be a class action under Rule 23(e) and therefore notice was required. *Wallican v. Waterloo Community School District*, 80 F.R.D. 492 (N.D. Iowa 1978); *Magana v. Platzer Shipyard, Inc.*, 74 F.R.D. 61 (S.D.Tex.1977); *Duncan v. Goodyear Tire & Rubber Co.*, 66 F.R.D. 615 (E.D.Wis.1975); *Rotzenburg v. Neenah Joint School District*, 64 F.R.D. 181 (E.D. Wis.1974); *Held v. Missouri Pacific Railroad Co.*, 64 F.R.D. 346 (S.D.Tex.1974); *Muntz v. Ohio Screw Products*, 61 F.R.D. 396 (N.D.Ohio 1973); *Washington v. Wyman*, 54 F.R.D. 266 (S.D.N.Y.1971); *Rothman v. Gould*, 52 F.R.D. 494 (S.D.N.Y.1971); *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481 (N.D.Ill.1970); *Gaddis v. Wyman*, 304 F.Supp. 713 (S.D.N.Y.1969); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 42 F.R.D. 324 (E.D.Pa.1967).

■ The purposes to be served by the imposition of Rule 23(e) requirements to putative class actions are twofold. First, it protects the class defendant from plaintiffs who append a class claim merely to strengthen their bargaining power in settlement discussions. Requiring that Rule 23(e) notice be sent out deters the filing and alleging of frivolous class actions—that is, the time and cost of effecting the notice requirement make a plaintiff consider carefully the consequences of filing a class claim. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949); *Rothman v. Gould*, 52 F.R.D. 494, 496 (S.D.N.Y.1971).

In addition to this institutional or defendant's concern, requiring notice to putative class members also insures that the putative class members' interests will be protected. This prejudice might occur in spite of the fact that the putative class members are not barred by res judicata. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1311 (4th Cir. 1978). Note, *Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1541–42 (1976) [hereinafter cited as *Developments*]. A set-

tlement of the class action could affect the putative class in several ways—the settlement may seek to achieve structural relief that putative class members may not agree with; if the relief is in the form of both structural and compensatory relief, trade-offs at the expense of the putative class may occur; finally, the relief may be from a limited fund and thus putative class members may have no recourse for compensatory relief. *Armstrong v. Board of School Directors*, 616 F.2d 305, 313 (7th Cir. 1980); *Developments, supra*, at 1552–54.

While the emphasis these decisions place on protecting putative class members from prejudice and class defendants from frivolous class claims should not be underestimated, it appears that the absolute application of Rule 23(e) and the reasoning behind such an absolute rule may prove too much—often at the expense of other important individual and institutional policies. First, converting every potential class claim into a class action requiring rule 23(e) notice as well as other full class treatment will be time consuming and costly. Thus, the potential beneficiaries of the relief—the putative class—may actually be harmed by a rule meant to protect their interests. *Shelton*, 582 F.2d at 1311. Notice and a certification determination can be extremely costly matters—which could be taxed against the class relief or serve as a deterrent to the filing of class actions. *Id.* Also, the time delay involved in notice and a certification determination may well delay the relief eventually provided to the class members. Therefore, a rule requiring notice in a settled case which has not been certified may be injurious to the interests of the putative class members.

An absolute rule would also cause institutional problems. The legal system should favor and encourage the voluntary resolution of litigation. Settlements spare the judicial system the expense and time that is attendant to the full panoply of pre-trial, trial, and post-trial proceedings. *Armstrong*, 616 F.2d at 313 (7th Cir. 1980). Thus, requiring notice and a certification determination would impair the settlement

of class actions. Also, representative class plaintiffs may choose to drop out their class claim, even if it has merit, in order to settle their own claims. Thus, the efficiency as well as societal benefit of the class action device will not come to be appreciated. *Id.* at 313.

■ In sum, we believe that there are serious shortcomings with a rule that would require that Rule 23(e) be applied to all settled class actions which have not been certified. To be sure, there may be instances where the need for notice or class certification prior to settlement is absolutely necessary to protect the rights of putative class members. In those cases the district court, in its discretion and acting pursuant to Rule 23(d) as well as its general equity power, may order notice. Therefore, rather than setting down an absolute rule we choose to place discretion in the district court to assess the prejudice to absent class members caused by the settlement, the institutional costs of notice and a certification hearing, as well as other factors relevant to this determination.[20]

The approach we adopt is fully consistent with that set out by the Fourth Circuit in *Shelton v. Pargo,* 582 F.2d 1298 (4th Cir. 1978). In *Shelton* plaintiffs filed a class action alleging violations of Title VII and seeking injunctive and monetary relief. While the motions for class certification were pending, settlement negotiations began. Eventually, plaintiff settled his individual claim and then sought a stipulated dismissal under Fed.R.Civ.P. 41. The district court believed that notice was required under Rule 23(e) because putative class members might be relying on prosecution of the action to protect their own rights.

The court of appeals reversed, holding that Rule 23(e) simply did not apply to a class action which is not certified. The court reasoned that since putative class members were not barred by the settlement, any abuses attendant to non-certified class actions which are settled can be controlled by the discretionary supervisory power under Rule 23(d). The court acknowledged that in some instances due process considerations may require notice and a precertification hearing. However, the court concluded that these problems were best left to the discretion of the district court. Thus, absent prejudice to putative class members or the abuse of the class action device, a case could be settled without notice to the putative class.

As stated above, we agree with the Fourth Circuit and conclude that the absolute notice requirement of Rule 23(e) is inapplicable to settled cases which have not been certified. However, we emphasize that district courts should scrupulously scrutinize the terms of settlement agreements for the impact on absent putative class members.

### B.

Plaintiffs contend that notice was not required under the criteria of *Shelton* —absent putative class members were not bound by the judgment nor was there a reliance expectation of the absent putative class members since the lawsuit was filed only six days before the money was to revert to the Treasury.

■ We cannot agree with plaintiffs' characterization of the prejudice to absent putative class members. Although the judgment did not bind absent putative class

---

**20.** Of course, as we note, other factors besides prejudice to the absent putative class members may be relevant to a determination of the need for notice and a certification determination. One such factor is the presence of collusion between plaintiffs and defendants in settling a case. *Shelton,* 582 F.2d at 1314–15. In the present case, there have been allegations by Capital of collusion between CSA and plaintiffs' counsel which Capital argues requires that the settlement be vacated. Because we dispose of this issue on other grounds we need not decide whether collusion existed. We do note, however, that there are no findings in the record which conclude that collusion existed.

The possibility of collusion and the reliance interests of absent putative class members often can constructively be analyzed in terms of the requirement of Rule 23(a)(4) ("the representative parties will fairly and adequately protect the interests of the class.")

members, the practical effect of the settlement was to distribute the $18 million dollar fund of CIP funds in a manner that may have been contrary to the interests of putative class members. The prejudice to the absent individuals is evident at several levels. Assuming that the absent individuals would have chosen that the funds be spent in providing programs rather than individualized damage payments, there is no guarantee that they would decide to seek the mix of structural relief eventually agreed upon. More importantly, the class representatives (and their counsel) had to decide how to spend the funds. They decided that having the money fund programs rather than attempting the long and laborious task of identifying class members and determining the form of relief was a better alternative. But it cannot be doubted that some individuals might have preferred to receive the monetary payment rather than the program funding.[21] By identifying and notifying the individuals, they would be given this choice; and failure to do so unfairly prejudiced their rights in the matter.

Notice and an opportunity to be heard are the touchstones of procedural due process. We conclude that entry of the settlement without notice violated the due process rights of the absent putative class members.[22]

## IV.

Having concluded that notice to absent putative class members was required and therefore that the settlement was properly vacated, plaintiffs would urge us to remand the case for a determination of class certification. The district court, in its order of October 30, 1980, concluded that the case could not properly be maintained as a class action. Plaintiffs contend that the district court's conclusion is erroneous substantively and furthermore that the procedure used by the district court to dispose of the issue was erroneous. Before discussing these contentions we set forth the procedural history of the class action issue.

A class claim was included in plaintiffs' original complaint. On October 18, 1979 plaintiffs filed a motion for class certification which was taken under advisement. At the January 4, 1980 hearing the district court indicated that it would rule for plaintiffs on the issue of the validity of the regulation and that the next step was to certify a class. However, settlement negotiations followed and the class issue did not arise again until the district court *sua sponte* called for a status conference on whether to vacate the settlement decree. At this time the court expressed concerns about the manageability of a class action in the case. Finally, in its order vacating the settlement decree the court denied class

---

**21.** *See* Motion to Intervene filed by putative class member Fred Meagher.

 Plaintiffs contend that the individual absent putative class members were not prejudiced by the settlement because a remedy under the Tucker Act remained. 28 U.S.C. § 1346(a)(2). We disagree. To relegate plaintiffs to an uncertain remedy under the Tucker Act overlooks the practical effect of the judgment on plaintiffs' rights.

**22.** Plaintiffs argue that if notice was necessary, there was notice by publication sufficient to comply with the mandate of the Due Process Clause of the Fifth Amendment. Specifically, plaintiffs point to publication of the settlement terms in the May-June issue of Legal Services Corporation News; the May 2, 1980 issue of NSCLC Washington Weekly, a publication distributed to senior citizens' organizations and legal services projects; and the August 1980 issue of Clearinghouse Review, a publication

distributed to all legal services attorneys in the United States.

 We are not convinced that this notice was the best notice practicable under the circumstances. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). None of the publications were sent directly to the potential objecting class members but rather organizations which aided the elderly. While this indirect process may have informed some individuals, an effort to select publication in more widely read periodicals would have been a better attempt at notice.

 Finally, the notice sent out only notified interested individuals of the terms of the settlement and in no way informed individuals of their right to intervene in the action or the right to sue for damages on an individual basis. Therefore, the notice was inadequate in notifying absent putative class members of possible prejudice to their individual claims.

certification, again emphasizing the manageability problems.

 Initially we note that our review of the district court's denial of class certification is limited. We can reverse this determination only if the district court's decision denying certification was an abuse of discretion. *Patterson v. General Motors Corporation*, 631 F.2d 476, 480 (7th Cir. 1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981) (*citing Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977)); *Adashunas v. Negley*, 626 F.2d 600, 605 (7th Cir. 1980).[23]

 The parties, as did the district court, focus on the concept of "manageability" of a class action and whether the issue of each individual plaintiff's state of mind makes the class action unmanageable.[24]

**23.** An initial matter for consideration is whether the dismissal of the claims of the individual class plaintiffs renders the case moot. Recently, the Supreme Court held that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980). Thus, we have jurisdiction to review the district court's denial of class certification.

**24.** Although the district court did not attempt to categorize which category of Rule 23(b) this class action fell under, its reference to the concept of manageability implies a determination that this was a 23(b)(3) class action. Fed.R. Civ.P. 23(b)(3)(D) (court must consider "difficulties likely to be encountered in the management of a class action.") At one point plaintiffs contend that this is a 23(b)(2) class because their complaint was framed as requesting declaratory, mandamus, and injunctive relief. Brief of Plaintiffs-Appellants at 68 and note *; and that manageability is not a proper consideration in a (b)(2) class determination. For the following reasons we reject plaintiffs' contentions.

First, it is not at all clear that the problems in managing a class action are not relevant in certifying (b)(1) and (b)(2) class actions. Some of the problems which arise in all of the subdivisions of Rule 23(b) are common to all forms of class action—identifying a class, cost of notice of settlement, and administrative burdens on the court in managing the litigation. This is especially true because the purpose of Rule 23 is to allow an efficient mechanism for disposing of multiple claims. *Developments, supra*, at 1322; 3B Moore's Federal Practice ¶ 23.02[1], at 23–35 (3d ed. 1980).

Second, the record before us indicates that this case, if certifiable, would have to be certified under Rule 23(b)(3). While plaintiffs attempt to characterize their complaint as one for declaratory and injunctive relief, it is clear that the final form of the relief obtained would be monetary in nature. Class certification under (b)(2) is not appropriate where the relief requested (or in this case obtained) is monetary in nature. *Al Barnett & Son, Inc., v. Outboard Marine Corp.*, 64 F.R.D. 43, 53 (D.Del.1974), *aff'd*, 611 F.2d 32 (3d Cir. 1979); 3B Moore's Federal Practice ¶ 23.45[1] at 23–322. Furthermore, although plaintiffs' complaint did request injunctive and declaratory relief, as we note below, the declaration as to the invalidity of the regulation and a judgment awarding relief to members of the class are two completely separate legal issues. The latter depends on proof of whether the existence of the invalid regulation discouraged class members from applying for the assistance. Plaintiffs actually requested that the class members be compensated in some form for these lost benefits—specifically, through the consent decree or funding of programs.

We do note an argument for (b)(1)(A) certification not raised by plaintiffs. There is a line of authority that holds that where plaintiffs seek distribution of money from a limited fund, class certification under (b)(1)(A) is appropriate. *Cass Clay, Inc. v. Northwestern Pub. Serv. Co.*, 63 F.R.D. 34, 37 (E.D.S.D.1974); *Hernandez v. The Motor Vessel Skyward*, 61 F.R.D. 558, 561 n.8 (S.D.Fla.1973). Illustrative are the facts in *Cass Clay*. Plaintiffs sued defendant utility company for rate overcharges to utility customers. The court concluded that because plaintiffs sought distribution from a single fund there would be a risk of inconsistent adjudications which would establish incompatible standards of conduct for defendant—that is, multiple distribution plans. Therefore, the court concluded that certification under (b)(1)(A) was appropriate. We conclude that this line of cases is inapplicable to the present fact situation. This case is a limited fund case only because of the way that these plaintiffs have pursued the settlement structuring—had putative class members been notified and been able to decide the proper course of action the fund would not have been depleted to the detriment of absent class members. Also, cases such as *Cass Clay* which follow the "limited fund" analysis are not necessarily the only way of analyzing these cases. Courts also have held that the mere fact that damages would have to be paid to some plaintiffs and not to others in a subsequent action does not place the case in the (b)(1)(A) category. *Crasto v. Estate of Kaskel*, 63 F.R.D. 18, 21 (S.D.N.Y. 1974); *Hernandez*, 61 F.R.D. 558, 561 n.8 (dictum). Furthermore, the presence of individual

We agree that the issue of "state of mind" does make this case difficult to manage as a class action. However, we also conclude that the class action fails for other reasons.

### A.

It is axiomatic that for a class action to be certified a "class" must exist. *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); 3B Moore's Federal Practice, ¶ 23.-04[1] at 23–111 (3d ed. 1980). In the present case serious problems existed in defining and identifying the members of the class. As noted above, the complaint defined the class as those individuals eligible for CIP assistance but who were denied assistance or who were discouraged from applying because of the existence of the invalid regulation promulgated by CSA.

Cases have recognized the difficulty of identifying class members whose membership in the class depends on each individual's state of mind. *De Bremaecker*, 433 F.2d at 734; *Chaffee v. Johnson*, 229 F.Supp. 445, 448 (S.D.Miss.1964), *aff'd on other grounds*, 352 F.2d 514 (5th Cir. 1965), *cert. denied*, 384 U.S. 956, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966); *Capaci v. Katz & Besthoff, Inc.*, 72 F.R.D. 71, 78 (E.D.La.1976). In *De Bremaecker* a class action was filed on behalf of all state residents active in the peace movement who had been harassed or intimidated as well as those who feared harassment or intimidation in the exercise of their constitutional rights. The court held that this did not satisfy the requirement of an adequately defined and clearly ascertainable class. First, the court noted the ambiguity inherent in the term "peace movement." Even aside from this ambiguity, however, the court went on to discuss

another problem in identifying the class— the theory of the complaint was that state law chilled residents in the exercise of their first amendment rights. It could not be concluded that all state residents were "chilled" in such a manner and therefore there was no way to identify those individuals affected by defendant's policies. *See also Chaffee*, 229 F.Supp. at 448 (class described as all persons working to end race discrimination and encouraging blacks to exercise rights held too vague because depends on each individual's state of mind); *cf. Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) (differences in misrepresentations alleged as well as degrees of reliance thereon made class suit inappropriate).

Problems similar to those in *De Bremaecker* exist in the present case. The first problem is to identify those individuals who qualify for CIP assistance. This by no means is an easy or inexpensive task. *Cf. Ihrke v. Northern States Power Company*, 459 F.2d 566, 572 (8th Cir.), *vacated as moot*, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972) (deny class certification because of vagueness of class which included all persons who because of poverty are unable to pay for utility service). After completing this task, the court and parties would have to proceed with the Sisyphean task of identifying those individuals who not only qualified for CIP assistance, but also knew of the existence of the regulation and were discouraged from applying for assistance because of the shut-off notice requirement. Such an attempt to identify those individuals who were "chilled" would be a burden on the court and require a large expenditure of valuable court time.[25]

issues in the lawsuit—that is, each putative class member's state of mind—renders the case unsuitable for (b)(1)(A) classification because the need to litigate individual issues prevents the possibility of varying adjudications which might establish incompatible standards of conduct. *Tober v. Charnita, Inc.*, 58 F.R.D. 74, 81 (M.D.Pa.1973); 3B Moore's Federal Practice ¶ 23.35[1] at 23–370 (3d ed. 1980).

**25.** In *Developments, supra*, at 1478 n.128 it is observed that the "state of mind" rubric has been applied too loosely to reject class action

suits where the class members could be identified by some action or objective manifestation. The article then goes on to critique the holdings in *De Bremaecker* and *Chaffee* because the class in each case actually was defined in terms of actions and not the beliefs of the plaintiffs. *Id.*

While such a distinction between actions and beliefs may be difficult to articulate in great detail, we believe that even if this distinction has any validity in general, it does not require a different result in the present case. Arguably,

██ Identification of the class serves at least two obvious purposes in the context of certification. First, it alerts the court and parties to the burdens that such a process might entail. In this way the court can decide whether the class device simply would be an inefficient way of trying the lawsuit—for the parties as well as for its own congested docket. Second, identifying the class insures that those actually harmed by defendants' wrongful conduct will be the recipients of the relief eventually provided.

The district court was well aware of problems in identifying the class. At the hearing on January 4, 1980 the district court stated:

How are we going to find out which persons were chilled from applying because of knowledge of this shutoff notice requirement? How are we going to gather the facts on which persons, other than your named plaintiffs, were turned down on that account in the region? We could spend the 15 million dollars gathering the facts in this case. I say that facetiously, but by the time we gather them, it will be another year down the road and then we would be in the '81 program before we decided who was actually entitled to any money. Is it worth it?

App. at 191.

At the October 6, 1980 hearing on vacating the settlement decree the district court

discussed the problems of identifying class members:

As discussed at that hearing, the opening of the program—there were a lot of problems with that. One was the fact—one the problem of identifying or determining eligibility of those people one year later who had been denied assistance or discouraged from complying [*sic*].[26]

At another point during the hearing, the district court examined, in greater detail, the problems of identifying the class:

We decided, I think correctly, that that was not a class action, and I am not inclined to reopen that issue at this time. The practical difficulties of identifying persons who might be entitled to the money ... seem[s] to argue strongly against class certification.

Hearing of Oct. 6, 1980, App. at 218. Plaintiffs' counsel also noted the difficulty of identifying the class:

Now it was precisely because of the amorphous class that you mentioned that after extensive discussions with the defendants, the plaintiffs' counsel reluctantly agreed that it was impractical to try to deliver those benefits to the individual members of the class because it would cost $18 million to locate them.

Hearing of Oct. 6, 1980, App. at 219.

These statements make it evident that the district court, as well as the parties,

---

the putative class members' state of mind could be described as conduct—failure to apply—rather than their state of mind—discouraged from applying, and therefore the criticism of the article would apply to this case. The change of characterization of the issue in the case from one of state of mind to conduct should not serve as a talisman to decide the difficult issue of whether an identifiable class exists. At best, the general statement that state of mind issues are present serves as a shorthand method of alerting the court and the parties that there might be difficulty in identifying the class members. Also, the classification of an issue as "belief" or "conduct" does not resolve the issue, since many matters of "conduct" by putative class members may nonetheless make the class difficult to identify.

We believe that whether characterized as "state of mind" or "conduct" the putative members of this class would be difficult to identify. In reaching this conclusion we em-

phasize the cost and time of the court and parties which would have to be expended before the class could even possibly be identified. Finally, the presence of state of mind issues should not be an automatic reason for denying class certification, and the above article emphasizes this point. However, in exercising its discretion, the district court may focus on this factor, among others, in considering the viability of a class suit. In the circumstances of this case we observe that not only were there problems in identifying the class, but also with the other requirements of Rule 23, discussed *infra*.

**26.** Hearing of Oct. 6, 1980, App. at 211. Although this comment was made in the context of discussing reopening the 1979 program—an alternative eventually rejected by the parties—the discussion of class member identification remains relevant in other contexts.

were aware of the problems attendant to identifying the members of the class.[27] The district court believed that it would require a great deal of its own time as well as a large amount of money to accomplish this task. In light of these circumstances this certainly was a proper factor for the district court to consider in denying class certification.

**B.**

As discussed in note 24 *supra* we believe that as this litigation progressed and the nature of the relief became apparent, certification, if possible, would have been under subdivision (b)(3) of Rule 23. Rule 23(b)(3) sets forth four non-exhaustive criteria for the court to consider when making the class determination.[28] Although not considered

**27.** Plaintiffs contend that they "were never afforded an opportunity to either present briefs or be heard on the class issue prior to summary disposition by the court." Reply Brief of Plaintiffs-Appellants at 25. *See also* Brief of Plaintiffs-Appellants at 60–63. Plaintiffs' contention simply is not borne out by the record. Although plaintiffs' memorandum filed in opposition to the motion to vacate the settlement decree does not directly address the issue of class certification, but is alluded to only in a footnote, App. at 108 n.*, defendants' brief did address the issue, *id.* at 136–38. Also, plaintiffs argue that there is nothing in the record to indicate that the district court considered manageability of the class action, except in the context of reopening the 1979 program. As we stated in note 26 *supra*, the problems of class identification and cost of identification and notice are relevant to the entire class issue. To be sure, the problem of reopening the 1979 program may have raised other administrative problems. However, the problem of class identification and notice to putative class members is relevant not only on the issue of reopening the 1979 program but the issue of class certification *vel non.*

Plaintiffs also cite to several cases which require procedural safeguards in disposing of class certification issues. *Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (9th Cir. 1974); *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 345 (10th Cir. 1973) (need for findings to accompany denial of class certification); *Shepard v. Beaird-Poulan, Inc.*, 617 F.2d 87, 89 (5th Cir. 1980), *on reh'g*, 638 F.2d 909 (1981) (error to deny class certification without holding an evidentiary hearing). We find the principles enunciated in these decisions inapposite to our present inquiry. In *Price* the district court dismissed the complaint which included a class allegation without anything but a conclusory comment that the complaint "fails to state a proper case for permitting this suit to be brought as a class action." 501 F.2d at 1179. The court of appeals reversed, stating that on a bare record of complaint, answer and motion to dismiss there is "nothing to show why a class action should not proceed." We find *Price* distinguishable. In the present case the district court held several hearings at which the class certification issue was discussed. Also, the district court, unlike *Price*, did discuss the relevant criteria of Rule

23 in disposing of the certification issue. Finally, the district court's experience with the class action issue in *Grieg v. Olivarez*, No. 78–C–1646 (N.D.Ill.1978), fully alerted it to the problems in managing this class action.

Plaintiffs urge us to also reverse on the basis that no evidentiary hearing was held on the class issue. Again, as noted above, the issue of class certification was explored by the parties and the district court at the several hearings held on the settlement decree and on the motion to vacate. In *Shepard*, which relied on *Guerine v. J. & W. Investment, Inc.*, 544 F.2d 863, 865 (5th Cir. 1977) (per curiam), the court eventually held that no evidentiary hearing need be held because the case became moot after denial of class certification. Therefore, our focus must be on the analysis in *Guerine*. Unfortunately, *Guerine* is only a two-page per curiam opinion and offers little in the way of careful analysis. However, we do not read *Guerine* as setting forth a per se rule requiring an evidentiary hearing in every instance disposing of the class certification issue. This is clear from plaintiffs' citation of *Marcera v. Chinlund*, 565 F.2d 253, 255 (2d Cir. 1977) (per curiam), *vacated on other grounds sub nom. Lombard v. Marcera*, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979) (denial of class certification should not *ordinarily* be made without an evidentiary hearing) (emphasis added). In certain circumstances an evidentiary hearing may be necessary for full evaluation of the class issue. But we do not believe that an absolute rule is necessary to insure full explication of the class issue; especially in the present circumstances where the class issue was discussed at several points in the litigation and plaintiffs' counsel conceded the difficulty of managing the case as a class action.

**28.** Although neither the parties nor the district court considered the issue of predominance in discussing or disposing of the class action issue, we consider it proper for discussion on appeal. To be sure, appellate courts ordinarily should not discuss those issues not briefed or argued by the parties. *Mapp v. Ohio*, 367 U.S. 643, 674, 81 S.Ct. 1684, 1702, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). However, this is "rather an axiom of experience than a rule of law." *Foulkes v. Commissioner Internal Revenue*, 638 F.2d 1105, 1109 (7th Cir. 1981) (*quot-

by the district court under the particular rubric of predominance, we consider the requirement of predominance of especial significance in analyzing the propriety of class certification in this case.

Rule 23(b)(3) provides:

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and in addition . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. . . .

The notion of predominance in the class action analysis is a relatively impalpable concept. Several alternative analytical frameworks attempting to give substantive content to the concept have been articulated in various lines of cases.[29] Most courts have looked to economies in trying the case as a class action. At the extremes the analyses have ranged from whether the total time trying both common issues and separate issues would be less than trying all issues separately to whether the total time

spent trying common issues would be greater than time spent on trial of individual issues. These analyses are plainly inadequate. The former would render the "predominance" requirement nugatory since if at least one issue could be tried in common the requirement would be satisfied. As to the latter approach, it would unduly block class actions from going forward because only the most complex of common questions would require more litigation time than a series of individual trials.[30]

Our inquiry into the predomination analysis must take two steps. Our first focus must be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements. Second, after examining the proof necessary we must inquire into the form that trial on these issues would take. At this point it also becomes necessary to examine the procedural devices and alternatives available in trying class actions. This discussion interfaces with many aspects of the issue of manageability and the possibili-

---

*ing Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 53, 73 L.Ed. 170 (1928) (Holmes, J.) (discussing rule prohibiting use of extrinsic aids in statutory interpretation)). We believe that when the issue is fully developed in the record and the judicial inquiry will not be impaired, issues not briefed nor argued may be discussed on appeal.

**29.** Unfortunately the verbal formula used to analyze the concept provides little guidance to the inquiry. Courts have usually looked to tests for answering the question but in fact the analysis usually turns into a conclusory discussion concerning which questions predominate or are most significant to the cause of action. *Developments supra,* at 1505–07; 3B Moore's Federal Practice ¶ 23.45[2] at 23–328–329. Illustrative of this conclusory approach is *Banks v. Travelers Insurance Co.,* 60 F.R.D. 158 (E.D. Pa.1973). In *Banks* plaintiff sued alleging fraud in the making of an insurance contract. The court held that plaintiff's class could not satisfy the requirements of subdivision (b) because the cause of action was individual in nature—that is, each plaintiff must prove the misrepresentation made, that the misrepresentation was relied upon, and that the misrepresentation caused the loss. *Id.* at 163. The court acknowledged that common questions did exist but that the number of separate issues "exceed[ed]" the number of common issues. The case would break down into individual

lawsuits and therefore there was no predomination. *Id.* The predomination analysis in *Banks* may be described as either "counting"— that is, do the common issues outnumber the separate issue—or as the "degeneration to separate trials" analysis—that is, will the case end up as a series of separate trials.

Of course, taken to its extreme the "counting" or "degeneration to separate trials" analysis would lead to rather harsh results. No class action with multiple issues, some of which are separate, could proceed unless the common issues exceeded in number the separate issues. Indeed, the "degeneration to separate trials" analysis would produce even harsher results, essentially precluding class treatment whenever separate issues had to be tried. Such an approach has not been accepted since it would gut Rule 23(b) of its basic policy. Also, it ignores the possibility of subclassing, a viable alternative in resolving such problems. *Hirschi v. B. & E. Securities, Inc.,* 41 F.R.D. 64, 67 (D.Utah 1966); *Developments, supra* at 1515.

**30.** *Developments, supra* at 1505–06. For an example of these two approaches see *In re Antibiotics Antitrust Actions,* 333 F.Supp. 278, *modified,* 333 F.Supp. 291 (S.D.N.Y.1971) and *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968).

ty of a fluid recovery alternative. Again at this point the substantive policies of the legal rights at issue bulk large in the analysis.

As we have noted above, plaintiffs' cause of action can be broken down into two distinct elements. First, was the CSA regulation inconsistent with the statute authorizing CSA to fund programs? This issue is common to the entire class and requires no separate inquiry into the actions or beliefs of individual class members. It is an issue resolvable in an expeditious manner through the class device. All that would be required would be memoranda of law on whether the regulation is consistent with the statute. Indeed, the district court indicated that summary judgment for the plaintiffs would be appropriate on this issue.[31] Therefore, this issue would be appropriate for class determination.

However, the second issue for resolution—that described as the state of mind issue—raises different considerations and problems of proof. The focus here is on the impact of the invalid regulation and the damage that it caused the individual class members. It is the effect of the invalid regulation on the individual plaintiffs which constitutes the crux of the case. Proof of this element of the cause of action will be extremely individualized. This issue is not common to the entire class but rather depends on each individual's state of mind.

To prove that each individual was discouraged from applying for assistance would initially require proof that the individual knew of the regulation. This would require a long series of mini-trials and would be an arduous task for the parties as well as the district court.

Conjecture as to how proof at trial would be adduced illuminates the difficulty of the task. Individual plaintiffs would be called to testify on how they knew about the regulation. On cross-examination defendants probably would inquire as to the source from which plaintiffs learned of the regulation. Was it read in a newspaper? What newspaper and on what date? Was it heard on the radio, and if so at what time during the day? Was a leaflet received through the mail from either a public or private source? If so, what did the notice state?[32] Thus, it is apparent that defendants' conduct of the lawsuit at even the initial stage of whether plaintiffs were aware of the regulation could lead to serious administrative problems. This is complicated by the fact that the "state of mind" issue raises serious issues of credibility that are peculiarly within the province of the finder of fact and require individualized consideration.

The substantive elements of plaintiffs' claims therefore indicate that trial of the state of mind issue would require consideration of each separate claim.[33] Also,

---

**31.** Perhaps this explains plaintiffs' contention that the class proceed as a (b)(2) class. Rule 23(b)(2) provides:

> An action may be maintained as a class action if ...
> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

Certainly a class action which sought only to have the CSA regulation declared invalid would be appropriate for (b)(2) certification and apparently plaintiffs contend that this is exactly what the present action concerns. However, plaintiffs claim damage to the class members in that they were discouraged from applying for benefits and therefore denied benefits. Therefore, plaintiffs primarily seek monetary relief

and certification, if appropriate, would be under (b)(3).

**32.** Another complication in the whole matter is apparent. It is probable that many class members, if they were aware of the regulation, were informed through third party sources—that is, it is unlikely that the plaintiffs read the actual text of the regulation. Therefore, the defendants might attempt to inquire as to whether the terms of the regulation were misstated by either the media or other organizations.

**33.** In this way, the analysis we utilize is similar to that set out in *In re Memorex Security Cases*, 61 F.R.D. 88 (N.D.Cal.1973). *Memorex* provides an excellent example of how consideration of the substantive elements of the claim and how proof of the elements would proceed are relevant to a decision on the class issue. In *Memorex* the class consisted of those defraud-

we have noted that a series of individual trials would be required for resolution of this issue. This does not end the predomination analysis but is only the first matter for consideration. The use of separate trials on individual issues of fact should not be an absolute bar to the use of the class action device. Rather, we must examine whether any procedural devices can be utilized that would alleviate the burdens of such a trial procedure.

In this way the present case is similar to *Crasto v. Estate of Kaskel*, 63 F.R.D. 18 (S.D.N.Y.1974). In *Crasto* the plaintiffs, shareholders in a cooperative apartment building, filed a class action on behalf of all persons who at any time held shares in the cooperative. Class members consisted of individuals seeking either damages or rescission. Plaintiffs alleged that defendant made oral and written misrepresentations. The court denied class certification under subdivision (b)(3) because common issues did not predominate.[34] In reaching this conclusion the court first noted that fraud cases may be unsuitable for class treatment if there are variations in the representations made or degrees of reliance thereon. *Id.* at 23.[35] Thus, it was not a common issue because the representations might have been different as to various class members and in fact might never have reached some class members. *Id.* Rather than conclude its analysis at this point, the court continued to discuss the procedural devices which might alleviate the problem—specifically, use of subclasses. However, the court concluded that subclasses would do little to solve the problem. It reasoned that the use of subclasses would not avoid the basic problem that each class member would have to be called to testify on the representations made as well as the causation and reliance on the representations. Thus, use of subclasses would do little to ease the burden on the court.[36]

ed by defendants' representations. Defendants contended that class certification was inappropriate because each plaintiff must prove reliance and defendant wished to depose and cross-examine every plaintiff. *Id.* at 97. The court conceded that if this were true common issues would not predominate. Also, a bifurcated trial would not solve the problem of individual issues of reliance since it would merely delay the issue to a later date and at that point the complications would arise. *See also Windham v. American Brands, Inc.*, 565 F.2d 59, 71–72 (4th Cir. 1977) (en banc), cert. denied, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). The court proceeded to discuss the substantive law on the elements of the claim and how proof would proceed on the elements. This solved the problem because proof of reliance in securities cases does not require particular proof as to individual reliance. Thus, the litigation in *Memorex* would not require individual proof of reliance but merely proof of materiality—which would be common to the class. *Id.* at 99. This would, therefore, solve the problem of the individual adjudication of the issue of reliance.

**34.** The court's verbal framework for discussing the predominance issue was whether the class was more bound together by common questions than divided by individual matters. 63 F.R.D. at 22. A cursory examination of this approach reveals that this merely restates the question of whether common issues predominate. While the court's approach does fail in this manner, the analysis eventually used does transcend this rather hollow approach.

**35.** Those cases involving large-scale fraud in the area of securities, or antitrust cases, particularly pose the difficulties of certifying a class where representation and reliance vary as to each class member. *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973); *Hirschi v. B & E Securities, Inc.*, 41 F.R.D. 64 (D.Utah 1966); *Gatzke v. Owen*, 69 F.R.D. 412 (N.D.Miss.1975); *Carlisle v. LTV Electrosystems, Inc.*, 54 F.R.D. 237 (N.D.Tex.1972); *Tober v. Charnita, Inc.*, 58 F.R.D. 74 (M.D.Pa.1973); *Seligson v. Plum Tree, Inc.*, 61 F.R.D. 343 (E.D.Pa.1973); *In re Memorex Securities Cases*, 61 F.R.D. 88 (N.D. Cal.1973).

**36.** Other courts have recognized that the suggestion of subclasses as a procedural device to solve some problems in class action suits is not a panacea. In *Hirschi*, 41 F.R.D. 64, the class consisted of purchasers of defendants' stock who alleged a violation of Rule 10b–5. The issues of reliance and knowledge of the fraud were not common to the class and therefore would have required that each class member be brought before the court to decide the issue. The court rejected the use of subclasses stating that this was no solution because eventually all individuals would have to be brought before the court. *Id.* at 67.

One possible alternative in this case would be to create a subclass of plaintiffs who actually

Similarly, subclasses could do little to ease the burdens of individual trials in the present case. As in *Crasto* there may well be variations in the representations made as to the substance of CSA's regulations. Also, issues of reliance or causation—that is, whether the invalid regulation caused the harm—would not be solved by subclassing. Each class member would have to testify on the matter of knowledge and reliance and thereby impose an intolerable burden on the district court. Thus, subclassing would not be available as an alternative procedure.

Another possible procedural alternative, and one which actually is reflected in the settlement decree, is the use of a fluid recovery. The fluid recovery is used where the individuals injured are not likely to come forward and prove their claims or cannot be given notice of the case. *Developments, supra* at 1522. In a fluid recovery the money is either distributed through a market system in the way of reduced charges[37] or is used to fund a project which will likely benefit the members of the class.[38]

Plaintiffs similarly contend that in the instant case the fluid recovery remedy will provide redress for the general class of individuals harmed by defendants' conduct. In raising this contention plaintiffs rely on *Bebchick v. Public Utilities Commission*, 318 F.2d 187 (D.C.Cir.) (*en banc*), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963).

*Bebchick* concerned a challenge to a rate increase by the Washington, D.C. transit system. The court of appeals invalidated the rate increase and in a supplemental opinion addressed the issue of how to structure a judgment to carry out the opinion of the court—since the illegal rate had been in effect for a time prior to invalidation. The court acknowledged that it was not possible to order refunds to individuals who had paid the increased fare. Nevertheless, the court ordered that the Transit should utilize the money for the benefit of the users of the system. *Id.* at 203–04.[39]

The analogy of *Bebchick* to the present case is not unfounded. Yet, we believe that an analysis of the fluid recovery mechanism must take a more critical tack. Plaintiffs apparently contend that the harmed individuals cannot be identified and therefore a fluid recovery should be utilized. Strictly speaking, plaintiffs' contention proves too much. It sets forth no criteria for determining when class certification is unnecessary and when the requirements of class certification may be restructured. Indeed, to accept plaintiffs' position would be to ignore the requirements of Rule 23, such as whether an identifiable class exists and whether notice to the class can be executed.[40] Therefore, we reject any approach

applied and were turned down for the assistance because of failure to produce a shut-off notice. In this way, it might be contended, the "state of mind" issue could be avoided. This suffers from several defects. It is not clear that this would provide the relief requested in the original complaint. Also, it is not clear that the individuals who actually applied would be any easier to identify or notify. Finally, because many of the individuals who actually applied may have been rejected through oral communications individual issues would remain for trial.

**37.** *See, e. g., Bebchick v. Public Utilities Comm'n*, 318 F.2d 187, 203–04 (D.C. Cir.) (*en banc*), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); *Colson v. Hilton Hotels Corp.*, 59 F.R.D. 324, 326 (N.D.Ill.1972).

**38.** *See, e. g., West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 734 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied sub nom.*

*Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). For a general discussion of the fluid recovery mechanism see Note, *The Cy Pres Solution to the Damage Distribution Problems of Mass Class Actions*, 9 Ga.L.Rev. 893, 894 (1975); Note, *Damage Distribution in Class Actions: The Cy Pres Remedy*, 39 U.Chi.L.Rev. 448 (1972).

**39.** For a discussion of the use of fluid recovery in *Bebchick* see *Developments, supra*, at 1529–30.

**40.** There can be little doubt that the use of a fluid recovery mechanism allows a court to avoid some of the manageability problems in a Rule 23(b)(3) class action. *See* discussion of manageability *infra*. *See also Windham*, 565 F.2d at 72 (cannot use fluid recovery to avoid manageability problems inherent in proving individualized damages).

which would automatically utilize a fluid recovery mechanism as a procedural alternative to class action disposition.

At the other extreme is the position that a fluid recovery mechanism is unconstitutional. The argument raised is that it violates defendant's right to trial by jury. *See, e. g., Dickinson v. Burnham*, 197 F.2d 973, 980–81 (2d Cir.), *cert. denied*, 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952); *Developments, supra*, at 1524–25. In *Windham v. American Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977) the Fourth Circuit Court of Appeals apparently rejected the use of a fluid recovery. The court stated:

> Nor . . . can the difficulties inherent in proving individual damages be avoided by use of a form of "fluid recovery." Such a method of computing damages in a class action has been branded as "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper."

*Id.* at 72.[41]

We need not adopt either of the two extreme positions—that is, whether a fluid recovery always can be used to surmount problems in the going forward of a class

action or whether a fluid recovery is per se unconstitutional.[42] Rather, we believe that a careful case-by-case analysis of use of the fluid recovery mechanism is the better approach. In this approach we focus on the various substantive policies that use of a fluid recovery would serve in the particular case. The general inquiry is whether the use of such a mechanism is consistent with the policy or policies reflected by the statute violated. This matter can be more particularized into an assessment of to what extent the statute embodies policies of deterrence, disgorgement, and compensation.[43]

First, we focus on whether a fluid recovery is needed to deter the defendant from illegal conduct. We think not. CSA has been charged with administering a large and complex program and it is inevitable that problems arise. While in no way do we applaud or encourage the passage of invalid regulations, there is no indication that CSA's actions have been in bad faith or with the specific intent of disobeying its statutory obligation.[44] This is not a case where the defendant has intentionally violated a statute which was intended to regulate socially opprobrious conduct—such as that reflected in the antitrust or securities

---

**41.** The court in *Windham* did not set forth when, if ever, use of a fluid recovery would be appropriate. It merely cited *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973) (*Eisen* III), *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**42.** Another objection raised to the use of a fluid recovery is that it alters the substantive rights of the defendant and therefore exceeds the scope of the Rules Enabling Act. *Sibbach v. Wilson & Co., Inc.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). In *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43 (D.Del. 1974) the court refused to certify a class because common issues did not predominate, the issues of injury and damage being individual to each class member. The court rejected use of a fluid recovery holding that it would alter the substantive law of antitrust by essentially eliminating plaintiffs' proof of injury and damage. *Id.* at 55. Such a result, the court stated, would exceed the scope of the Rules Enabling Act. *Id.*

**43.** *In re Memorex Security Cases*, 61 F.R.D. 88 (N.D.Cal.1973) reflects this analysis, although not in the context of a fluid recovery. This does not detract from the persuasiveness of the reasoning of *Memorex*. In *Memorex* the court was confronted with problems of predominance and manageability. The court acknowledged the existence of these problems but determined that certain procedures (allowed because of the nature of the substantive law) could avoid the manageability problems. In determining that the class action should go forward the court noted that not to allow that result would mean that corporations would be encouraged to commit fraud. Thus, the court concluded that on balance the policies of deterring fraud and disgorging illegally obtained profits outweighed the manageability problems.

**44.** To be sure, it appears that the regulation at issue was contrary to the relevant statutory framework. Yet the record also makes clear that CSA was unsure of its obligations to fund certain programs in light of recent appropriations acts.

laws. Thus, the deterrence factor weighs against the use of a fluid recovery.[45]

The second factor, that of disgorging illegally obtained profits, also counsels against use of a fluid recovery. Those cases where a corporate defendant engages in unlawful conduct and illegally profits is most appropriate for a fluid recovery. In this manner, the *Bebchick* decision also involved the disgorging of profits illegally obtained. The transit system of Washington relied on private investment and profits were returned to investors. The court of appeals properly ordered that the Transit not retain the illegally obtained profits. In the present case neither CSA, nor any shareholders, benefited financially from its allegedly illegal conduct. Rather, if anything, CSA would have been able to disburse more funds had the regulation not been in effect. The money CSA refused to spend merely reverted to the Treasury. In sum, this is not a case where the defendant would retain illegally obtained profits—once the termination date of the program passed CSA no longer had the money to spend and did not benefit from its unlawful conduct.

The final factor, whether the statute has a compensatory purpose, does weigh in favor of fluid recovery. The Act authorizing CSA to administer assistance programs had as its chief aim assisting low income individuals in dealing with the high cost of energy. Indeed, the purpose of the statute is purely compensatory.

However, we believe that even this factor does not clearly require fluid recovery. For fiscal year 1980 Congress funded a much larger energy assistance program and therefore absence of fluid recovery will not deprive plaintiffs of relief. The plaintiffs in this action challenged CSA's administration of the 1979 CIP. For 1980 CSA administered an energy assistance program of approximately 1.6 billion dollars. The program was referred to as the "Energy Crisis Assistance Program" (ECAP). 44 Fed.Reg.

58876 (1979). App. at 127. (Letter of Dockterman to Moran). This funding was part of a congressional appropriation made in 1979. Pub.L.No.96–126, 93 Stat. 954 (1979). Therefore, the amount of money at issue in the instant case which offered assistance to the poor and the elderly, while hardly trivial, is quite a bit less than the funding provided for CSA in fiscal year 1980.

In light of these three factors we believe that the use of a fluid recovery mechanism is not necessary to further the substantive policies at issue. The policies of deterrence and disgorgement are inapplicable and therefore weigh heavily against fluid recovery. To be sure, the compensatory policy is seriously implicated by the withholding of this relief. Yet, as we note above, the needy individuals continued to receive assistance through appropriations for 1980. Thus, even the compensatory policy does not definitively lead one to conclude that fluid recovery is needed. In sum, the relevant policies weigh against fluid recovery.[46]

C.

Much of our discussion of the issue of predominance overlaps with the concept of manageability. As noted above, any discussion of predominance must incorporate the concept of manageability because the issues for individual adjudication may be adequately managed with certain procedural devices. Nonetheless, there are factors within the concept of manageability which have significance independent of the notion of predominance. One such problem which is of special concern to courts is the problem of notice. 3B Moore's Federal Practice, ¶ 23.45[4–4] at 23–370.

In *Schaffner v. Chemical Bank*, 339 F.Supp. 329 (S.D.N.Y.1972) the plaintiff class sued the trustee for improper management of plaintiffs' investments. The class included approximately five thousand trusts, which included thousands of benefi-

---

**45.** This distinguishes *Memorex*, where defendant allegedly engaged in a large-scale fraud on owners of its securities.

**46.** *See Developments, supra*, at 1522–27 for a discussion of these factors in assessing the use of a fluid recovery.

ciaries and remaindermen. The court held that the case should not be certified as a class action. One of the factors the court emphasized was the difficulty of notifying all of the class members:

> Management of this case as a class action could create substantial and unnecessary difficulties....
>
> [T]he problem of individual notice to the income beneficiaries and remaindermen of the modern day trusts presents enormous problems.

339 F.Supp. at 335.[47]

Similarly, the district court, in this case, was aware of the problems of identifying the class members and then notifying them. Hearing of Oct. 6, 1980, App. at 218. While the number of members of the putative class members is not clear, it does appear that the number of participants in CSA programs numbered more than one million. The cost of notifying the class members, attempted after the difficult task of identifying these individuals, was a proper factor to consider in denying class certification.[48]

The problems of the individual issues of knowledge of the regulation and whether or not the individuals were discouraged from applying for assistance because of the regulation along with problems of identifying the class members lead us to conclude that use of the class action device would have been unmanageable.[49]

---

**47.** See also Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D.Ill.1973); United Egg Producers v. Bauer Int'l Corp., 312 F.Supp. 319 (S.D.N.Y.1970); School Dist. v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967).

**48.** Our analysis has focused on problems of identifying the class, whether common issues predominate, and problems of manageability. Plaintiffs contend that difficulties inherent in managing the class cannot be the sole reason for denying class certification. However, as is clear from our analysis, managing the class action has not been the sole reason for our decision upholding the denial of class certification.

**49.** Plaintiffs rely on the fact that Judge Grady previously had certified two sub-classes in an action challenging CSA's administration of the 1978 CIP. Grieg v. Olivarez, No. 78–C–1646 (N.D.Ill.1978). Plaintiffs overlook the fact that the factual and legal issues involved and relief awarded in the Grieg litigation varied significantly from those in the present case—differences which lead us to conclude that a class action would not be an expeditious way of dealing with the present litigation.

In Grieg plaintiffs claimed: 1) that the May termination date established by the Director of CSA was arbitrary and capricious and in violation of the Impoundment Act; 2) that certain regulations were adopted in violation of the APA; 3) the regulations denied them procedural due process because they did not provide for notice, explanation, or appeal from adverse decisions. Judge Grady entered summary judgment for plaintiff on all three grounds and certified two subclasses of persons entitled to relief. One of the subclasses included "all low income persons aged 60 and over who were discouraged from applying [for assistance],"

Addendum of Defendants-Appellees at 139—a class strikingly similar to the class in the present case. Compare App. at 2 (Complaint of plaintiffs describing putative class). After deciding the issue of liability the parties worked out a consent judgment that ordered CSA to continue to obligate funds from the 1978 program past the original termination date. The order also required CSA to revise its eligibility standards and include notice and appeal rights.

The legal issues in the present case, as discussed in our section on predominance, would require a great deal of individual inquiry. Also, class identification would be expensive and time consuming. In Grieg there were several objective indicia of class member identification. The first sub-class consisted of those eligible who were denied assistance without notice or opportunity for written appeal and therefore at least includes those who actually applied for assistance. The second sub-class also includes individuals who were applied and denied assistance. Thus, identification of the class in Grieg posed problems vastly different from the present case.

Second, the issues of notice to class members and allowing class members to choose their relief apparently never were pursued in Grieg. We need not decide what class procedure was proper in Grieg. In the present case, however, the issue of notice has arisen. That matter is significant in disposing of the class issue. Because the difficulties attendant to notifying the class apparently were not argued in Grieg, we believe Grieg simply is not persuasive authority. See Frankfurter, Mr. Justice Roberts, 104 U.Pa.L.Rev. 311 (1955) (explaining Justice Roberts' change in vote in the minimum wage cases on the basis that different arguments were made in the later case) cited in Foulkes, 638 F.2d at 1108 n.12.

Finally, we note the difference between the relief requested in Grieg and the present case.

## V.

Plaintiffs contend that *ex parte* contacts by the intervening United States Senators deprived plaintiffs of due process. These *ex parte* contacts consist of a letter written by Senator Paul Laxalt to defendant Rios and "inquiries into the propriety of the order" made by Capital[50] to Judge Grady's office. Plaintiffs argue that they were not given Capital's motion to intervene and request for relief from the settlement order until the day of the status conference and were never served a copy of Capital's memorandum in support of their motion to vacate. This, plaintiffs' contend, is a violation of due process because they were unable to respond to the allegations made by Capital.

Before examining plaintiffs' allegations, we consider it provident to set forth more fully the facts of the particular incidents. The Laxalt letter at issue was not addressed to Judge Grady; a copy apparently was sent to Judge Grady. Plaintiffs were given an opportunity through oral argument and the filing of memoranda to respond to Capital's motion to vacate; and Judge Grady did not issue a decision on the matter until after hearing argument and reading the memoranda.

Not all *ex parte* proceedings violate due process or even raise a serious constitutional issue. *Cf.* Fed.R.Civ.P. 65(b) (temporary restraining order may be entered without notice to adverse party). Nor is there an absolute right to be orally heard on the disposition of a legal issue. *Dredge Corporation v. Penny*, 338 F.2d 456, 462 n.14 (9th Cir. 1964).[51] Thus, at the first level or our analysis we reject any notion of due process which would place an absolute prohibition on all *ex parte* contacts or proceedings.

The essence of procedural due process is notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). Therefore, our analysis as to the particular facts of this case must focus on plaintiffs' opportunity to participate in the decision to vacate the settlement decree and in the motion to intervene and whether the *ex parte* contacts unfairly prejudiced plaintiffs.

In the present case plaintiffs had an opportunity to present their views on the motion to vacate both at oral argument and through a written memorandum.[52] The district court did not dispose of intervenor's motion prior to giving plaintiffs notice and

In *Grieg*, the relief was more in the nature of injunctive and declaratory relief which ordered CSA to continue funding programs and ordered CSA to modify its procedures. Such a request for class-wide injunctive relief may well have been proper under Rule 23(b)(2). In the present case plaintiffs sought to distribute the damages and thus issues of an individual nature arose. These individual issues (and notice) made the class action device inappropriate.

**50.** Capital represented the interests of the three Senators.

**51.** In *Dredge* the district court granted summary judgment without allowing oral argument. The court held that this procedure was invalid but specifically indicated that its decision did not rest on due process grounds, 338 F.2d at 462 n.14, since due process does not absolutely require a right to be orally heard.

**52.** Plaintiffs argue that they never were served a copy of Capital's Memorandum in Support of the motion to vacate the settlement order. Our perusal of the record does indicate that there is

some factual support for plaintiffs' allegation. The memorandum does not include a proof of service, apparently in violation of N.D.Ill.R. 7(b). We do not find this prejudicial in the facts of this case. The matters in the intervenor's brief were fully explored at the hearing of October 6, 1980 and our examination of plaintiffs' memorandum convinces us that they were not misled or prejudiced by this apparent oversight by Capital. *Cf. Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 709–10 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (post-trial service of trial briefs not violation of due process).

While we do believe that this apparent failure to serve was an oversight by Capital, this apparent disregard of court rules along with Capital's *ex parte* contacts, while not a violation of plaintiffs' due process rights, are extremely troubling to us. We admonish Capital to ensure that all its future contacts in litigation be a matter of record and that opposing counsel be informed of these matters and served with all relevant documents.

an opportunity to be heard. In such a case, serious due process problems may arise. However, when the litigants are not prejudiced by the contact and are given a full opportunity to participate in all legal proceedings there is no prejudice.

Those decisions analyzing the effect of *ex parte* contacts in the administrative context have looked to the prejudice caused by the contacts. In *Coastal States Gas Corp. v. Department of Energy*, 495 F.Supp. 1300 (D.Del.1980), the Department of Energy's (DOE) Office of Special Counsel for Compliance (OSC) issued an order alleging that Coastal had engaged in illegal sales of petroleum. The matter was to be adjudicated by DOE's Office of Hearing and Appeals (OHA). OHA received comments by the staff of OSC suggesting that all of Coastal's customers be parties to the proceeding. Before Coastal could respond to OSC's comments, OHA included the customers in the proceeding. Thereafter, Coastal filed a motion to vacate this decision, to which OSC responded. This motion was denied by OHA as was Coastal's petition for further review of this matter. On appeal Coastal contended that OSC's *ex parte* contacts on this matter violated due process. Specifically, Coastal contended that OHA decided the issue before receiving Coastal's comments on the issue. The court rejected this contention stating that even if there had been a due process violation at the first step, this was cured by OHA's subsequent consideration of Coastal's contentions. The court also noted that there was nothing in the record which indicated that OHA's initial consideration of the decision rendered it

impossible to give Coastal's position fair consideration. *Id.* at 1308.

In full adversarial proceedings rather than administrative proceedings this principle of prejudicial error in the context of *ex parte* contacts also has been acknowledged.[53] In *United States v. Green*, 544 F.2d 138 (3d Cir. 1976), *cert. denied sub nom. Tefsa v. United States*, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977) defendant claimed that *ex parte* conversations between the trial judge and the court-appointed psychiatrist which concerned defendant's competency to stand trial violated due process. Neither defendant nor his counsel was a party to the conversations. The court of appeals rejected defendant's allegation of error. The court first stated that not all *ex parte* contacts with the trial court require reversal. 544 F.2d 146 n.16. Furthermore, there was an opportunity for the defendant to cross-examine the psychiatrist concerning these conversations and the contacts were not clandestine but made a matter of record. In light of these facts, the court held that the *ex parte* communications did not violate due process.

We consider several factors of especial significance in concluding that the *ex parte* contacts did not violate due process under the present circumstances. First, there is nothing in the record to indicate that Capital's contacts with the district court rendered it impossible for the district court to fairly consider plaintiffs' argument on the issues. Second, the contacts were made a matter of record in the case and were not clandestine in nature.[54] Third, both

---

**53.** This absence of prejudice in the present case distinguishes the cases relied upon by plaintiffs. *Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. United States*, 585 F.2d 254, 263 (7th Cir. 1978); *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir.) (Coffin, J.), *cert. denied sub nom. Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *Haller v. Robbins*, 409 F.2d 857, 860 (1st Cir. 1969). Similarly, in some of the cases relied upon by plaintiffs the *ex parte* contacts were relied upon by the decisionmaker. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 53–54 (D.C. Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *United States v. Rosner*, 485 F.2d

1213, 1229 (2nd Cir. 1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

**54.** In the cases cited by plaintiffs the contacts were either never made a part of the record or made too late for the opposing party to respond. *U. S. Lines v. Federal Maritime Comm'n*, 584 F.2d 519, 539–40 (D.C. Cir. 1978); *Home Box Office*, 567 F.2d at 53–54; *Rinehart v. Brewer*, 561 F.2d 126, 132 (8th Cir. 1977); *United States v. Huff*, 512 F.2d 66, 70 (5th Cir. 1975); *Rosner*, 485 F.2d at 1229; *United States v. Solomon*, 422 F.2d 1110, 1119–20 (7th Cir.), *cert. denied sub nom. Sommer v. United States*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970).

through oral and written presentation plaintiffs were able to respond to Capital's contentions. There was nothing to indicate that the district court did not consider these arguments in making its decision. Fourth, the substance of Capital's contacts apparently was similar to the contents of the papers eventually filed in the court. Therefore, plaintiffs had an opportunity to respond to these contentions.

In light of these factors we conclude that plaintiffs' due process rights were not violated. As noted above, we emphasize what facts are not presented to us: the contacts were not kept secret; the court did not make up its mind before plaintiffs' input into the case; finally, the plaintiffs had a full opportunity to participate in the decisionmaking process.

## VI.

Plaintiffs also contend that the *ex parte* contacts by the Senators violated the separation of powers doctrine. We consider this argument to be entirely without merit and believe it requires only brief discussion.

Plaintiffs draw our attention to *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). At issue in *Nixon* was the Presidential Recordings and Materials Preservation Act which abrogated an agreement between then President Nixon and the Administrator of General Services regarding the possession and storage of President Nixon's papers and recordings. Essentially, the Act directed the Administrator to take custody of presidential materials and determine which are personal or private in nature and which are of historical value. The Act also provided for use of the materials in judicial proceedings.

Former President Nixon challenged the constitutionality of the Act and contended that it violated the principle of separation of powers. The Court rejected this contention and held that there was no invasion of the executive branch by Congress. 433 U.S. at 445–46, 97 S.Ct. at 2791.

The Court first dispelled any notion of the separation of powers doctrine that would require "three airtight departments of government." 433 U.S. at 443, 97 S.Ct. at 2790.[55] The Court believed the relevant analysis to be a functional one:

[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

433 U.S. at 443, 97 S.Ct. at 2790 (citations omitted).

In the present case our inquiry need go no further than the first level of inquiry—whether the potential for disruption of the constitutionally assigned functions of one branch are present. We see no reason to set forth in great detail the scope of the judicial authority created by Article III itself.[56] In this case, it is clear that the district court was able to perform its functions without the encroachment of a coequal branch of government. As the record indicates, the issues raised by the Senators were disposed of by a hearing and the presentation of full memoranda—the usual procedure utilized in a United States District Court. Also, the record makes it clear that the district court was able to exercise

**55.** *Quoting Nixon v. Administrator of General Services*, 408 F.Supp. 321, 342 (D.D.C.1976). *See also* The Federalist No. 47 (J. Madison) 325–26 (J. Cooke ed. 1961); 1 J. Story, Commentaries on the Constitution § 525 (M. Bigelow 5th ed. 1905).

**56.** Most separation of powers problems arise in the context of defining the relationship between executive and legislative power. *See, e.*

g., *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Springer v. Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928). Under the facts of this case we also conclude that the Laxalt letter did not constitute an unconstitutional invasion of the executive branch by the legislative.

its independent judgment disposing of these matters. In light of these circumstances we conclude that the minimal *ex parte* contacts did not violate the separation of powers doctrine.

## VII.

Plaintiffs also argue that Gray Panthers of Chicago (Gray Panthers) has standing to sue as an association on behalf of its members. We disagree. In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court set out general principles for determining when an association can sue on behalf of its members. In *Warth*, the Court stated that

> [e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individu-

al participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. at 511, 95 S.Ct. at 2211 (cited in *Hunt*, 432 U.S. at 342–43, 97 S.Ct. at 2440–41). In *Hunt* the Court restated these principles of associational standing as: 1) whether the members would otherwise have standing to sue in their own right; 2) whether the interests sought to be protected are germane to the organization's purpose; and 3) whether the claim asserted or relief requested requires the participation of individual members in the lawsuit. 432 U.S. at 343, 97 S.Ct. at 2441.

We see no reason to discuss whether the first two criteria of the *Hunt* test are met. Rather, we believe that the case fails because of the need for individual participation in the action. As we noted in part IV *supra*, the second element of plaintiffs' cause of action—whether individuals were discouraged from applying for assistance because of the existence of the invalid regulation—requires individualized proof as to each class member's state of mind. In such cases, as *Warth* and *Hunt* make clear, associational standing is inappropriate.[57]

---

57. The important relationship between the nature of relief requested and the problem of individual participation is emphasized in *Hunt* and provides an illustrative contrast to the complaint and relief prayed for in the present case. In *Hunt*, the associational plaintiff, Washington State Apple Advertising Commission (Commission), was an agency created by the state to promote and protect the state apple industry. 432 U.S. at 336–37, 97 S.Ct. at 2438. The Court held that the Commission had standing to sue in a representational capacity. *Id.* at 345, 97 S.Ct. at 2442. The Court did note that the Commission requested only declaratory and injunctive relief which did not require individualized proof. *Id.* at 344, 97 S.Ct. at 2441. *Compare Warth*:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy ... will inure to the benefits

of those members of the association actually injured.

> The present case ... differs significantly as here an association seeks relief in damages for alleged injuries to its members.... Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary whatever injury may have been suffered is peculiar to the individual member concerned and both the fact and extent of injury would require individualized proof.

422 U.S. at 515–16, 95 S.Ct. at 2213–14.

In the present case, as we note above, Gray Panthers do not seek merely to declare the regulation invalid but also seek damages for individuals who did not seek assistance. Thus, the relief requested in this case required individual participation. Also, this criteria of associational standing interrelates with our analysis of whether this is a (b)(2) or (b)(3) class. *See* note 24 *supra*.

Therefore, the judgment of the district court is affirmed.

SWYGERT, Circuit Judge, dissenting.

This is an appeal from an order of the district court vacating its previous approval of a consent decree pursuant to Fed.R. Civ.P. 60(b), on grounds of voidness and misrepresentation. I would reverse and remand the case for further proceedings consistent with this opinion.

I

This complaint was initiated by nine named plaintiffs on behalf of themselves and other similarly situated individuals[1] alleging that the Community Services Administration (CSA) unlawfully administered the 1979 Crisis Intervention Program (CIP), which provided for emergency assistance in payment of fuel bills to poor and elderly people pursuant to section 222(a)(5) of the Economic Opportunity Act of 1964, 42 U.S.C. § 2809(a)(5), *as amended by* Pub.L. No.95–568, 92 Stat. 2425 (1978). The complaint sought mandamus and injunctive and declaratory relief. A regulation promulgated by CSA required applicants to produce a notice to disconnect, 45 C.F.R. § 1061.53– 3(c), *as amended by* 44 Fed.Reg. 4481 (1979); the district court held the regulation unlawful because it was contrary to the statute and congressional intent.[2]

On September 26, 1979, plaintiffs filed motions for a temporary restraining order and a preliminary injunction to restrain CSA from returning unobligated funds from the 1979 CIP to the Treasury.[3] The district court granted the temporary restraining order, which was continued for ten days and thereafter indefinitely by agreement of the parties.

Plaintiffs then moved for partial summary judgment. At a hearing on January 4, 1980, Judge Grady indicated that he intended to grant the motion, and that the next step would be to certify a class. Defendants' counsel then suggested that the parties try to reach a settlement, and the case was continued for that purpose.

On April 25, 1980, the parties presented the district court with a copy of the final settlement, which was the product of approximately three months of negotiations.[4] Counsel for both parties recommended that the district court approve the settlement, which provided that the named plaintiffs each receive $250.00 and that the remaining unspent funds from the 1979 CIP be used to fund other CSA programs that were designed to reduce the impact of high energy costs upon the poor and elderly.[5] The district judge reviewed the proposed settlement, then signed and entered the consent decree.

1. The class was defined in the complaint as: all low income persons otherwise eligible for participation in the 1979 CIP who were denied 1979 CIP assistance by the federal defendants or discouraged from applying for assistance because they were not delinquent in the payment of their fuel bills for 1979.

2. The Economic Opportunity Amendments of 1978, § 5(d), 92 Stat. 2427 (1978), provided that "[e]ligibility for any of the programs authorized under this section shall not be based solely on delinquency in payment of fuel bills." The Conference Report on the amendments contained the same statement, H.R.Rep.No.95– 1766, 95th Cong., 2d Sess. 3 (1978).

3. The law required CSA to return unspent funds from the 1979 program to the Treasury by September 30, 1979. Pub.L.No.95–482, 92 Stat. 1604 (1978).

4. Plaintiffs' counsel initially raised two possible means of resolving the case: either reopening the 1979 CIP or putting the 1979 funds into the 1980 program. Defendants opposed both alternatives, and suggested instead that the estimated $18 million left over from the 1979 program be used to fund other CSA programs that were directed toward reducing the impact of high energy costs upon the poor and the elderly.

5. The programs to be funded under the terms of the settlement included a weatherization program to provide weather stripping to homes of low income families, a hypothermia program to provide counseling and clothing to senior citizens at risk from hypothermia, a solarization program to install solar collectors in the homes of low income families, and advocacy programs to provide legal assistance to low income persons involved in disputes with utility companies.

On August 20, 1980, the *Wall Street Journal* published an article in which the settlement order entered in this case was criticized as collusive and contrary to congressional intent. On September 16, 1980, Senator Paul Laxalt wrote to defendant Rios, stating that "our adversary system of justice may have been compromised by the settlement in the case." Senator Laxalt ordered CSA to stop disbursing funds pursuant to the consent decree until he had an opportunity to look into the matter further. The letter indicates that a copy was sent to Judge Grady.

According to its motion to intervene, Capital Legal Foundation, acting on behalf of Senators Laxalt, Orin Hatch, and Edward Zorinsky "pursued its inquiry into the propriety of the Order with Judge John F. Grady's office." Judge Grady, acting *sua sponte*, then scheduled a status hearing for October 6, 1980 because "[i]t has come to our attention that questions have been raised as to whether the [consent decree] in this case dated April 25, 1980, may provide for the funding of programs which Congress did not intend to be funded in this matter." Counsel for both parties were requested to appear, and Capital was given notice of the hearing.[6]

At the October 6 status hearing, Capital filed a motion to intervene and a motion to vacate the consent decree. The district judge denied the motion to intervene, but stated that he was "inclined to vacate the judgment order"; counsel for CSA agreed to halt further disbursement of funds while the parties briefed the question of the propriety of vacating the judgment.

On October 29, 1980, the district court entered an order vacating the consent decree pursuant to Rule 60(b)[7] on grounds of voidness and misrepresentation. The court concluded that since the case between named plaintiffs and defendants was settled by payment to plaintiffs of all that they were entitled to, and since no class was certified, then no case or controversy remained and the court therefore had no jurisdiction to approve the settlement. The court also questioned whether the court had the authority to enter the settlement order, and whether the expenditures provided for in the consent decree were consistent with congressional intent. The court further stated that counsel for both parties misled the judge by not disclosing relevant information regarding congressional intent and by not informing the court that without a court order the statute required that any unspent CIP funds be returned to the Treasury.

Plaintiffs appeal from the district court's order of October 29 vacating the consent decree. Plaintiffs contend on appeal that the April 25 judgment was not void, that the parties did not mislead the court, that ex parte communication between Capital and Judge Grady's chambers violated due process and separation of powers, and that the trial court erred in denying class certification.

## II

### A. Jurisdiction

On October 17, 1979, plaintiffs filed a motion for class certification. The district court approved the proposed consent decree, which compromised the claims of both named plaintiffs and absent putative class members, on April 25, 1980, prior to taking any action on the motion to certify. Then on October 29, 1980, the court entered an order vacating the settlement approval of April 25 on grounds of voidness and misrep-

---

**6.** Plaintiffs' attorneys state that they were not notified that counsel for Capital would appear, nor were they served with any of the papers filed by Capital in court on the day of the hearing.

**7.** Rule 60(b) provides in relevant part:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud ..., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; ... or (6) any other reason justifying relief from the operation of the judgment.... This rule does not limit the power of a court to ... set aside a judgment for fraud upon the court....

resentation under rule 60(b). In that order, the motion to certify was denied. The court reasoned that since no class had been certified, the only parties to the dispute were the named plaintiffs and defendants, so when the named plaintiffs settled their claims, no case or controversy existed among any of the parties. I disagree.[8]

The Fourth Circuit held in a recent case that "before a District Court may consider or approve a voluntary pre-certification settlement of an action begun as a class action, it is not compelled to undertake the laborious process of arriving at a certification determination under 23(c)(1) . . . ." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1314 (4th Cir. 1978). The court stated, however, that prior to approving a settlement, the trial court must hold a hearing to determine what claims are being settled, and whether absent putative class members would be prejudiced by the proposed settlement. "If, as a result of such hearing, the court is clearly satisfied that there has been no abuse of the class action device and no prejudice to absent putative class members, it may approve the settlement and dismissal without going through with a certification determination . . . ." *Id.*[9]

I would therefore reverse the trial court's determination that the court lacked jurisdiction to approve the settlement compromising the claims of both the named plaintiffs and absent putative class members. Although I recognize that in most cases the class certification issue should be addressed by the district court prior to approval of a settlement and dismissal, *see Susman v. Lincoln American Corp.*, 587 F.2d 866, 870 (7th Cir. 1978), the absence of a certification determination does not deprive the court of jurisdiction to approve a proposed settlement in a putative class action. Further, not only does the court have jurisdiction to approve a proposed settlement prior to certification, it has a duty to do so when the claims of the putative class are being compromised. *See Wallican v. Waterloo Community School District*, 80 F.R.D. 492, 493 (N.D.Iowa 1978) ("Rule 23's general purpose and its underlying policies . . . indicate that a . . . dismissal should be subject to court review . . . even prior to certification"). *See also McArthur v. Southern Airways, Inc.*, 556 F.2d 298, 302–03 (5th Cir. 1977); *Magana v. Platzer Shipyard, Inc.*, 74 F.R.D. 61, 66 (S.D.Tex.1977).

### B. Notice and Hearing

The majority concludes that the settlement violated the due process clause because notice of the proposed settlement should have been given to absent putative class members. Fed.R.Civ.P. 23(e) provides:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

The notice requirement of Rule 23(e) does not apply when certification has been denied. *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 177 (5th Cir. 1978), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976). Most courts to consider the issue, however, have held that the notice requirement does apply when parties propose to dismiss or settle prior to a decision on the certification motion. *E. g., McAr-*

---

8. *See* maj. op., p. 668 n.23 *supra*.

9. "[W]hatever uncertainties exist as to the precise status of an action brought as a class action, during the interim between filing and the 23(c)(1) determination by the court, it must be assumed to be a class action for purposes of dismissal or compromise under 23(e) unless and until a contrary determination is made." *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 42 F.R.D. 324, 326 (E.D.Pa. 1967). *Accord, McArthur v. Southern Airways, Inc.*, 556 F.2d 298, 302 (5th Cir. 1977); *Kahan v. Rosentiel*, 424 F.2d 161, 169 (3d Cir.),

*cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481, 483 (N.D.Ill.1970). *See also* 3B Moore's Federal Practice ¶ 23.50, at 23–424. *Cf. Susman v. Lincoln American Corp.*, 587 F.2d 866, 870 (7th Cir. 1978) ("when a motion for class certification has been pursued with reasonable diligence and is then pending before the district court, a case does not become moot merely because of the tender to the named plaintiffs of their individual money damages").

thur v. Southern Airways, Inc., 556 F.2d 298, 303 (5th Cir. 1977); Wallican v. Waterloo Community School District, 80 F.R.D. 492, 493 (N.D.Iowa 1978); Magana v. Platzer Shipyard, Inc., 74 F.R.D. 61, 66 (S.D.Tex. 1977); Duncan v. Goodyear Tire & Rubber Co., 66 F.R.D. 615, 616 (E.D.Wis.1975); Rotzenburg v. Neenah Joint School District, 64 F.R.D. 181, 182 (E.D.Wis.1974); Muntz v. Ohio Screw Products, 61 F.R.D. 396, 398 (N.D.Ohio 1973); Rothman v. Gould, 52 F.R.D. 494, 496 (S.D.N.Y.1971); Yaffe v. Detroit Steel Corp., 50 F.R.D. 481, 483 (N.D. Ill.1970); Philadelphia Electric Co. v. Anaconda American Brass Co., 42 F.R.D. 324, 328 (E.D.Pa.1967). The court in Shelton v. Pargo, supra, held that "in the pre-certification settlement of an action begun as a class action, a District Court is not automatically obligated to order notice to all putative class members under the terms of 23(e)," 582 F.2d at 1315, but may, "in its discretion, if it concludes that the 'fair conduct of the action' requires it, order notice to absent putative class members," id. at 1314.

I agree with the majority's holding that while 23(e) notice is not always required when a district court is considering pre-certification settlement, principles of due process and Rule 23(e) compel such notice in the case at bar. Here, the consent decree compromised the claims of both the named plaintiffs and absent putative class members. See Philadelphia Electric Co., supra, 42 F.R.D. at 327.[10] Although putative class members may not have been technically bound by the settlement, their interests were affected by it as a practical matter because the settlement exhausted the unspent funds from the 1979 CIP. They should therefore be given notice and an opportunity to object.

The type of notice to be given is a matter left to the discretion of the district court, "subject only to the broad 'reasonableness' standards imposed by due process." Grunin v. International House of Pancakes, 513 F.2d 114, 121 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Due process requires that the notice given be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Without expressing an opinion as to what type of notice would be required in the instant case, I note that while the Supreme Court has held that "individual notice must be provided to those class members who are identifiable through reasonable effort," Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974), it has also stated that "[t]his Court has not hesitated to approve of resort to publication . . . in cases where it is not reasonably possible or practicable to give more adequate warning." Mullane, supra, 339 U.S. at 317, 70 S.Ct. at 658.[11]

## C. Certification

Although I would hold that certification prior to approval of a proposed settlement is not a jurisdictional prerequisite, I also believe that the district court's denial of certification on October 29 was an abuse of discretion. I would therefore remand the case to the district court for reconsideration of the certification issue.

While "[t]he trial court has broad discretion in determining whether to allow a class action to be maintained," In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1129 n. 38 (7th Cir. 1979), cert. denied, 444 U.S. 870, 100 S.Ct.

10. The court in Philadelphia Electric stated that "the proposed settlements must be regarded as attempting to compromise the claims of the class, not just the named plaintiffs. Rule 23(e) clearly applies to this situation; indeed, due process concepts might well be held to require such notice, even in the absence of Rule 23(e)." 42 F.R.D. at 327.

11. If this class is certified pursuant to Rule 23(b)(2), the provision of the rule requiring individual notice to class members who can be identified through reasonable effort does not apply. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 n. 14, 94 S.Ct. 2140, 2152 n. 14, 40 L.Ed.2d 732 (1974); Childs v. U. S. Board of Parole, 511 F.2d 1270, 1276 (D.C.Cir.1974).

146, 62 L.Ed.2d 95 (1980), that discretion is limited by the principle that "Rule 23 must be liberally interpreted." *King v. Kansas City Southern Industries, Inc.*, 519 F.2d 20, 25 (7th Cir. 1975). The policy that "favor[s] maintenance of class actions . . . is especially strong in instances where denial of class status would effectively terminate further litigation . . . ." *Id.* at 26.

I believe that the putative class defined in the complaint, *see* note 1 *supra*, met all of the prerequisites for certification imposed by Rule 23(a) and (b)(2).[12] As defendants conceded both in the trial court and in their brief on this appeal, the requirements of Fed.R.Civ.P. 23(a) are met:

(1) since CIP was a nationwide program designed to help thousands of people, the persons affected by the challenged regulations were too numerous to make their joinder practicable;

(2) the question whether the regulations were valid was common to all putative class members;

(3) the claims of the plaintiffs-applicants were typical of the claims of the putative class members; and

(4) the representative parties appeared willing to pursue the litigation vigorously.

In addition, defendants stated that "the putative class [meets] the requirements of Rule 23(b)(2), because CSA applied its regulations to the putative class generally. If these regulations were invalid, CSA would have an obligation to the entire putative class to remedy its error."[13]

Policy considerations weigh heavily in favor of certification in the case at bar. If classwide relief is denied, it is highly unlikely that the persons injured by CSA's illegal regulation will receive any relief. Because each putative class member would be entitled to a maximum of only $250.00, individual suits by those persons would be impractical. Further, if the judgment vacating the consent decree is affirmed, the unspent funds from the 1979 CIP will be returned to the Treasury, thus exhausting the funds

---

**12.** Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .

A class action under 23(b)(2) seeking injunctive or declaratory relief may also include an incidental claim for monetary damages. *Society for Individual Rights, Inc. v. Hampton*, 528 F.2d 905, 906 (9th Cir. 1975).

I disagree with the majority's holding, *see* p. 668 n. 24 *supra*, that this class suit must be considered a 23(b)(3) rather than a 23(b)(2) action because the relief obtained was monetary in nature. "[A] class action for injunctive relief and damages properly brought under Rule 23(a) and (b)(2) should not be dismissed merely because a subsequent change in policy by the defendant has eliminated the necessity for future injunctive relief, leaving only the question of past damages for determination by the Court." *Arkansas Education Ass'n v. Board of Education*, 446 F.2d 763, 768 (8th Cir. 1971) (citations omitted).

In the instant case, plaintiffs requested in the complaint a declaration that the regulation at issue was invalid, an injunction prohibiting CSA from returning the unused funds to the Treasury, and an injunction requiring CSA to extend the deadline to apply for 1979 funds. As defendants conceded in the district court and on this appeal, *see* p. 687 *supra*, the relief requested by the putative class made it properly a 23(b)(2) action. A different conclusion is not required by the fact that CSA agreed not to return the funds to the Treasury pending the outcome or by the fact that the settlement called for monetary relief.

**13.** Because I would hold that the instant case is maintainable as a 23(b)(2) class action, there is no need to reach the questions of predominance of common issues of law and fact or manageability as discussed by the majority. *See Metropolitan Area Housing Alliance v. Department of Housing & Urban Development*, 69 F.R.D. 633, 639 (N.D.Ill.1976).

which would have been available to provide the relief necessitated by the invalid regulation.

The majority notes that there is an argument that the inclusion in the class of persons "discouraged [by the invalid regulation] from applying for assistance" renders the class too ill-defined for certification because identification of class members depends on each individual's state of mind, and cites a line of cases, holding that a class including "chilled" applicants cannot be certified, e. g., *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *Capaci v. Katz & Besthoff, Inc.*, 72 F.R.D. 71, 78 (E.D.La. 1976); *Miller v. Krawczyk*, 414 F.Supp. 998, 1000 (E.D.Wis.1976). There is, however, a second line of authority that supports the proposition that a class may include "chilled" plaintiffs. *Yaffe v. Powers*, 454 F.2d 1362, 1365–66 (1st Cir. 1972) (class maintainable under Rule 23(b)(2)); *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970).

The majority lists several problems that it believes would be encountered by the district court in attempting to identify class members in the instant case. First, the majority notes that identifying those who qualify for CIP aid "by no means is an easy or inexpensive task," see p. 669 *supra*. That is hardly an insurmountable obstacle, because CSA in administering the program had to identify applicants who qualified for aid.

The majority characterizes as "Sisyphean" the job of identifying those qualified persons who were discouraged from applying for assistance. Although I agree with the majority that such a procedure would

be a burden on the court, I believe that in certain cases considerations of justice require courts to undertake those tasks;[14] I would find this to be such a case. Further, the problem could be alleviated by giving notice by publication, see p. 686, *supra*, and by approving the settlement decree which provides for a "fluid" recovery, see maj. op. at 675.[15]

The majority points out that Judge Grady was aware of the problem of identifying class members in the case at bar. Nevertheless, in *Grieg v. Olivarez*, No. 78 C 1646 (Sept. 1, 1978), which concerned the Emergency Energy Assistance Program, the predecessor to the CIP, Judge Grady certified a class very similar to the one described in the complaint in this case:

(a) The sub-class for all low income persons otherwise eligible for participation in the EEAP who were denied EEAP assistance without written notice or opportunity for written appeal, or were denied the opportunity to submit written applications.

(b) The sub-class of all low income persons aged 60 and over living alone in households of no more than two persons whose household income is between 125 per cent and 150 per cent of CSA Poverty Guidelines and who were otherwise eligible for EEAP assistance but were denied such assistance due to income or *who were discouraged from applying.*

*Id.*, mem. op. at 12 (emphasis added). The problem of identifying "chilled" applicants was the same in both cases, yet the district court granted certification in *Grieg* but denied it here.

**14.** The Third Circuit, in considering procedural problems such as unmanageability, held that "[o]nce a court is convinced that a plaintiff's claims are of substantial merit, and that the class action device is the most practicable method of vindication, it must not allow encountered procedural difficulties to obviate its responsibility to adjudicate those claims." *Neely v. United States*, 546 F.2d 1059, 1071 (3d Cir. 1976).

**15.** I disagree with the majority's conclusion that a fluid recovery mechanism is inappropriate here. The statute's purpose, to reduce the

impact of high energy costs on low income people including the elderly and near poor, see p. 690 *infra*, is served by the settlement decree. Further, a fluid recovery is necessary in the instant case, where providing individual recovery would be difficult and procedurally costly but where such a recovery would remedy, at least in part, the wrong suffered by the class members as a result of the invalid regulation. See *Bebchick v. Public Utilities Comm'n*, 318 F.2d 187, 203 (D.C.Cir.1962) (*en banc*), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963).

Not only would I hold that the denial of certification was an abuse of discretion on the merits, I also believe that the procedure followed by the district court in determining the certification question was inadequate. No hearing was ever held on the issue of certification, and only defendant briefed the question in the district court. "Maintainability [of a class action] may be determined by the court on the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) (citation omitted). Although an evidentiary hearing on class certification is not required, it is certainly favored and would have been valuable in this case, given the close questions of manageability and identification at issue. *See Jones v. Diamond*, 519 F.2d 1090, 1098 (5th Cir. 1975); *Huff v. N. D. Cass Co.*, 485 F.2d 710, 713 (5th Cir. 1973).

### III

The district court stated in its October 29 order that "there was no lawful basis for the [settlement] order," and that therefore "the order [was] in reality an unjustified substitution of judicial fiat for legislative action in regard to the disposition of the money," and that the relief granted in the consent decree was "only arguably related" to congressional intent.[16] I disagree with the district court, and would find that clear statutory authority to enter the consent decree exists and that the expenditures provided for in the consent decree were consistent with congressional purpose.

### A. Statutory Authority

31 U.S.C. § 200(d) provides:

No appropriation or fund which is limited for obligation purposes to a definite period of time shall be available for expenditure after the expiration of such period except for liquidation of amounts obligated in accord with subsection (a) of this section . . . .

---

**16.** The majority did not reach this issue. *See* p. 663 n.16 *supra.*

Subsection (a) provides that funds are obligated by, *inter alia*, "a liability which may result from pending litigation brought under authority of law." 31 U.S.C. § 200(a)(6) (1976). Further, "a District Court is enabled . . . to order funds to be held available, beyond a statutory lapse, if equity so requires." *National Association of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321, 338 (D.C.Cir.1976). *Accord, National Association of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C.Cir.1977).

In *Neighborhood Health Centers, supra*, the court of appeals for the District of Columbia Circuit considered issues similar to those presented in the case at bar. Plaintiffs' complaint alleged that the Department of Health, Education and Welfare illegally administered the 1970 amendments to the Hill-Burton Act. The district court found certain violations that basically stemmed from HEW's approval of grants to some state plans that did not conform with the statute. The district court ordered HEW to recover the funds illegally granted. HEW then promulgated a remedial plan, which provided that states had to give priority to those applicants who have been denied funds under the previous unlawful administration of the statute. Plaintiffs objected to some aspects of the remedial plan, but the district court overruled these objections. The court of appeals affirmed, and directed HEW to continue operation of the remedial plan. 551 F.2d at 339.

In the case at bar, I agree with the majority's conclusion, *see* p. 662 n.15 *supra*, that the district court had the authority to enter the temporary restraining order preventing the return of unobligated funds from the 1979 CIP to the Treasury. I would further hold that the court had equitable power to approve the settlement to remedy CSA's unlawful administration of the 1979 CIP. I therefore believe that the district court erred in vacating the April 25 settlement order on the ground that there was no lawful basis for the court's entry of that order.

## B. Congressional Intent

The district court stated in its October 29 order that "the various expenditures required by the consent order were only arguably related to the Congressional purpose." I believe that the relief provided for in the consent decree is consistent with congressional intent, which should be broadly construed in the context of remedying past unlawful administration of the appropriated funds.

When Congress appropriated the money for CSA for fiscal year 1979, Pub.L. No. 95–824, 92 Stat. 1603 (1978), it did not place any limitations on CSA's administration of the funds beyond the restrictions contained in the Economic Opportunity Act as amended. The provision of the Act relevant to the program at issue here provides:

> A program to be known as "Emergency Energy Conservation Services" designed to enable low-income individuals and families, including the elderly and the near poor, to participate in energy conservation programs designed to lessen the impact of the high cost of energy on such individuals and families and to reduce individual and family energy consumption. The Director is authorized to provide financial and other assistance for programs and activities, including, but not limited to, an energy conservation and education program; winterization of old or substandard dwellings, improved space conditioning, and insulation; emergency loans, grants, and revolving funds to install energy conservation technologies and to deal with increased housing expenses relating to the energy crisis; alternative fuel supplies, special fuel voucher or stamp programs; alternative transportation activities designed to save fuel and assure continued access to training, education, and employment; appropriate outreach efforts; furnishing personnel to act as coordinators, providing legal or technical assistance, or otherwise representing the interests of the poor in efforts relating to the energy crisis; nutrition, health, and other supportive services in emergency cases; and evaluation

> of programs and activities under this paragraph.

42 U.S.C. § 2809(a)(5) (Supp. III 1979). This broad grant of authority clearly encompasses the type of expenditures required by the consent decree.

In the Supplemental Appropriations Act of 1978, Pub.L. No. 95–240, 92 Stat. 112 (1977), Congress appropriated $200,000,000 for the "Community Services Program" under CSA. A report from the Senate Appropriations Committee stated:

> The Committee recommends $200,000,000 for grants to low-income households to alleviate the burden of extraordinarily high residential heating costs during a winter emergency.

> * * * * * *

> The Committee directs that these funds be used only on a contingency basis when there is a clear and demonstrated energy emergency.

S.Rep. No. 95–564, 95th Cong., 1st Sess. (1977). Such statements in congressional reports, however, are not legally binding on government agencies, according to an opinion of the Comptroller General:

> Congress has recognized that in most instances it is desirable to maintain executive flexibility to shift around funds within a particularly lump-sum appropriation account so that agencies can make necessary adjustments for "unforeseen developments, changing requirements, incorrect price estimates, wage-rate adjustments, changes in the international situation and legislation enacted subsequent to appropriations."

> Accordingly, it is our view that when Congress merely appropriates lump sum amounts without *statutorily* restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on Federal agencies.

55 Comp.Gen. 318, 318–19 (1975) (emphasis added). *See also American Community*

*Builders, Inc. v. Commissioner,* 301 F.2d 7, 13 (7th Cir. 1962) ("Resort to legislative history has a place in judicial construction of statutes only when resort thereto is necessary to resolve a patent ambiguity in the language of the statute."); *United States v. United States Steel Corp.,* 482 F.2d 439 (7th Cir.) *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). No statements indicating an intent to restrict CSA's use of funds for "crisis" situations were contained in the bill appropriating funds for CSA for fiscal year 1979, Pub.L. No. 95–482, 92 Stat. 1603 (1978), nor in the congressional reports accompanying that bill.[17] I therefore believe that the expenditures provided for in the consent decree are consistent with the congressional purpose as expressed in 42 U.S.C. § 2809(a)(5) (Supp. III 1979).

### IV

Another ground upon which the district court relied in vacating the consent decree pursuant to Rule 60(b) was misrepresentation. In its order of October 29, the court stated:

> I believe that the parties, both by what they said and by what they did, misled me both as to the facts and the law. I believe they were aware, as I was not, that the various expenditures required by the consent order were only arguably related to the Congressional purpose and that the order was a bootstraps method of accomplishing those expenditures. Counsel imposed upon the court by failing to make a full disclosure of all relevant considerations.

*Simer v. Olivarez,* No. 79–C–3960, mem. op. at 9 (Oct. 29, 1980). The court also said that counsel failed to inform the court that without a court order, the unobligated funds had to be returned to the Treasury. I agree with the majority's holding that the record before us does not support the district court's conclusion.

### V

Plaintiffs contend that ex parte communication between Capital Legal Foundation, acting on behalf of Senators Laxalt, Hatch, and Zorinsky, violated due process. They further contend that ex parte contacts between the Senators and the court, and between the Senators and Rios, the director of CSA, violated the principle of separation of powers.

### A. Due Process

*Ex parte* communication between the Senators and the district court occurred first when on September 16, 1980, Senator Laxalt wrote a letter to Rios expressing the concern that "our adversary system of justice may have been compromised by the settlement in the case," and asking Rios to stop further disbursement of the funds by CSA. The face of that letter indicates that a copy was sent to Judge Grady, but counsel for plaintiffs did not learn of the letter until after the consent decree was vacated. Then Capital, according to their motion to intervene in this appeal, "pursued its inquiry into the propriety of the Order with Judge John F. Grady's office." Capital further stated that Judge Grady scheduled the status hearing of October 6, 1980 "[a]s a result of Capital's inquiries." Plaintiffs' counsel were not notified that counsel for Capital would appear at the status hearing, nor were they served prior to hearing with the motions[18] filed by Capital on the day of the hearing.[19]

---

**17.** Moreover, 42 U.S.C. § 2966 (1976) (Chapter 34 of Title 42) provides explicit authority for CSA to transfer up to twenty percent of appropriated funds to other programs under the Economic Opportunity Act, as amended. 42 U.S.C. § 2966 (1976) provides:

> Notwithstanding any limitation on appropriations for any program or activity under this chapter or any Act authorizing appropriations for such program or activity, ... not exceed 20 per centum ... of the amount appropriated or allocated from any appropriation for the purpose of enabling the Director

to carry out any such program or activity under this chapter may be transferred and used by the Director for the purpose of carrying out any other such program or activity under this chapter.

**18.** At the October 6 status hearing, Capital filed a consolidated motion to intervene and motion for relief from the order.

**19.** The failure to include a proof of service was in violation of N.D.Ill. Rule 7(b), as the majority notes. *See* p. 679 n.52 *supra.*

"[E]x parte communications shadow the impartiality, or at least the appearance of impartiality, of any judicial proceeding" and "may, in some circumstances, constitute a deprivation of due process of law." *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir. 1976). The *ex parte* communication in the case at bar was highly improper, and it appears likely that the district judge would not have called the status hearing but for the concerns raised by Capital in the *ex parte* communications. Nevertheless, "[i]n the absence of any showing that the [*ex parte* communications] infected the factfinder's determination of the issues at trial, ... the challenged practice [does] not violate ... due process of law." *Grieco, supra*, 533 F.2d at 719.

The majority concludes that, because plaintiffs had an opportunity to present their views on Capital's motion to vacate, the litigants were not prejudiced by the contacts. Although the majority characterized the *ex parte* contacts as "extremely troubling," they merely admonished Capital to improve its conduct of litigation in the future.

I believe that Capital's *ex parte* contacts and failure to serve all parties with copies of motions were blatantly inappropriate and violated principles of due process. It is axiomatic that the fair conduct of litigation requires that no party (or prospective intervenor) have contacts regarding the merits of a pending case with the judge or his staff absent notice to the other litigants and an opportunity for them to appear and be heard. The parties in this case were not afforded such an opportunity until well after a copy of Senator Laxalt's letter had gone to Judge Grady and Capital had had contacts with the judge's staff.

My examination of the record leads me to conclude that these *ex parte* contacts were prejudicial. First, as I noted previously, it is doubtful that the district judge would have reopened the case in the absence of those contacts. Second, plaintiffs' counsel

had no notice that Capital would appear at the hearing, nor did they have copies of Capital's motions to intervene and to vacate the settlement. Although plaintiffs had an opportunity to respond to those motions later in writing, the lack of notice prior to the hearing surely put them at some disadvantage in their arguments at the status hearing. Because these *ex parte* contacts were obviously unethical, I would find that the due process clause was violated; therefore, I would find that the order vacating the settlement decree is void and I would remand the case for reconsideration of certification and notice.

### B. Separation of Powers

As plaintiffs note, the Supreme Court has enunciated a threshold test for determining when an act of one branch of Government violates the doctrine of separation of powers:

> [I]n determining whether [an act of one branch] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents [another branch] from accomplishing its constitutionally assigned functions.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). As noted previously, while I would characterize the *ex parte* communication here, especially the letter from Senator Laxalt and Capital's contacts with Judge Grady's chambers prior to the October status hearing, as clearly improper, I cannot conclude that those contacts hindered or prevented the district court from carrying out its duties. I would therefore hold that no violation of the principle of separation of powers occurred. Nevertheless, I must state that as a general principle, *ex parte* communication from members of Congress to the judiciary regarding legislation at issue in pending litigation not only endangers the independence of the judiciary

but also has a tendency to undermine the fundamental doctrine of separation of powers.

I would also find that the communication between Senator Laxalt and defendant Rios did not violate the separation-of-powers doctrine. Defendant Rios, as director of CSA, had counsel to advise him regarding this case. I therefore think it unlikely that the letter from Senator Laxalt hindered him from performing his legal duties.

For the reasons stated, I would reverse the district court's order vacating the consent decree and remand the case for further proceedings.